Garnett P. MORGAN, et al., Appellants,

v.

DISTRICT OF COLUMBIA, Appellee.

No. 79–588.

District of Columbia Court of Appeals.

Argued En Banc Feb. 18, 1983.

Decided Sept. 30, 1983.*

* Judgment was entered on September 30, 1983.

Harlow Case, with whom Jack H. Olender, Washington, D.C., was on the response to the petition, for appellants.

Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., with whom Judith W. Rogers, Corp. Counsel, Washington, D.C., at the time of en banc argument, was on the petition, for appellee.

Before NEWMAN, Chief Judge, KERN, NEBEKER, MACK, FERREN, PRYOR, BELSON and TERRY, Associate Judges, and GALLAGHER and KELLY **, Associate Judges, Retired.

GALLAGHER, Associate Judge, Retired:

In an action for negligence and wrongful death against the District of Columbia, a jury returned a verdict in favor of appellants on March 6, 1979. On April 20, 1979, the trial court granted the District of Columbia's motion for judgment notwithstanding the verdict on the ground that appellants had failed to establish the applicable standard of care by which to measure the actions of police officers in the performance of their official duties. In a split-decision, a three-judge panel of this court reversed the trial court and reinstated the jury's verdict. *Morgan v. District of Columbia*, 449 A.2d 1102 (D.C.1982). The full court vacated the panel's decision and heard arguments en banc. We affirm the trial court's grant of the motion for judgment notwithstanding the verdict.

** Judge Kelly was an Associate Judge of the court at the time of en banc argument. Her

■ Absent a special relationship between police department and victim, liability for failure to protect individual citizens from crime does not generally lie against police officials, who occupy positions necessarily fraught with discretion in the administration of justice. Appellants do not fall within the narrow exception to this longstanding rule. Furthermore, the facts of this case, as a matter of law, cannot support a finding of negligence by the city.

In August 1974, Garnett Pinkney Morgan telephoned Metropolitan Police Department Seventh District Headquarters and spoke to Captain Francis J. Tiernan. She told Tiernan that her husband, Officer John Morgan, Jr., who was then assigned to the Seventh District, had threatened her with a gun the night before at their home in Maryland and a month earlier had beaten her, causing her eye to bruise. According to her testimony at trial, Morgan had come home in the early morning hours and after dragging her out of bed, "put the gun to my head and told me that if I didn't leave within the next couple of days, that he would kill me." Morgan then sat in the bedroom chair and eventually fell asleep, whereupon Garnett Morgan left for her mother's house, taking the two-year old and four-year old children with her.

That afternoon, Morgan called Captain Tiernan and explained what had happened, including the earlier eye injury. She told him that she was at her mother's house and was afraid that her husband was going to kill her. Garnett Morgan then asked Captain Tiernan if he "would just make [her husband] stay away" from her. Tiernan suggested she file a complaint with the Maryland authorities because the alleged assault had occurred in her Maryland home. She declined to do so because she did not want to "intimidate" her husband by "having police come to the house. I don't know what he may have done at that time." She also did not want to file a written complaint against her husband with Captain

status changed to Associate Judge, Retired, on March 31, 1983.

Tiernan; rather, she had called Tiernan "asking for his assistance with my husband, and just to ask [her husband] to stay away from me." Tiernan told her that he could not "put a man out of his own house," but that when Officer Morgan reported to work he would talk with him and call her back.

Captain Tiernan then contacted Lieutenant Bruce H. Swank, Morgan's immediate supervisor, and asked him to bring Morgan in to talk with them. Officer Morgan had been under Swank's command for the previous two years. During this time, according to Swank's trial testimony, Garnett Morgan had called him several times to complain that "her husband was fighting with her, and that he was beating on her, and generally, they were having family arguments." Each time she called, Swank, as part of his normal procedure in handling these kinds of incidents, asked whether a gun was involved, and each time Garnett Morgan said there was not. In Officer Morgan's personnel file, there was no indication of violent conduct during his five years with the department.[1]

Captain Tiernan and Lieutenant Swank met for a discussion with Officer Morgan, told him of Garnett Morgan's report that they had been fighting and, "told him that if he couldn't get along with his wife, that he should leave." After the meeting Tiernan called Garnett Morgan. According to her testimony, Tiernan told her that he "had talked with John and had explained some things to him, and he [Tiernan] said that maybe it would be best if we just separated." Thereafter, Garnett Morgan found an apartment and moved into the District of Columbia. She called Captain Tiernan to let him know that she was moving, and also to assure that Officer Morgan was at work when she moved from her

Maryland residence. Unable to ascertain this information immediately, she called several times until Tiernan finally was able to inform her that Morgan had reported and would be at work. She quickly packed her belongings along with some furniture and moved into the apartment, not informing her husband of her whereabouts and maintaining an unlisted telephone number.

Three months later, Officer Morgan arrived at his wife's apartment, choked her into unconsciousness, and forced her into his car. Threatening to kill her if she objected, he drove to her parents' home, took their two children and left. Garnett Morgan then called the police. Along with two other officers, Lieutenant John R. Bowles, Jr. responded to the call and she told him what had happened, including the beating in July and the August gun threat. Lieutenant Bowles contacted Officer Morgan and directed him to report to the precinct. Morgan said that he would do so after he brought the children to the Pinkney house. When Morgan arrived, he was met by the Lieutenant, but rather than proceed with him to the precinct, Morgan carried the youngest child, with the older child beside him, toward the house. Lieutenant Bowles walked behind them. Officer Morgan walked into the house, said to his wife, "I told you so," then took out his revolver and shot at her twice; one of the bullets wounded her and the other hit John Keith, his son. Morgan then turned and shot Lieutenant Bowles, shot and killed Elton Pinkney, and surrendered to the police.[2]

At trial, Garnett Morgan testified to the events of the preceding months, including her telephone call to Captain Tiernan informing him that Officer Morgan had threatened her with his service revolver.

---

1. Officer Morgan's employment history evinces numerous derelictions of duty, including leaving his post, lying twice to his superior officers, failing to answer a radio run and reporting late for roll call. In addition, prior to joining the police force he had been involved in an assault against a referee in a basketball game, but the prosecutor dismissed the case on a *nolle prosequi*.

2. This court subsequently affirmed his convictions for first degree murder and two counts of assault with intent to kill while armed. *Morgan v. United States*, 363 A.2d 999 (D.C.1976), *cert. denied*, 431 U.S. 919, 97 S.Ct. 2187, 53 L.Ed.2d 231 (1977).

Captain Tiernan testified that "general orders" require him to conduct an official investigation when anyone, including an officer's wife, reports an improper use of an officer's service revolver. Written statements from the individuals concerned must be obtained and a report and recommendation submitted to his superiors. Captain Tiernan testified that he did not "investigate" Garnett Morgan's complaint [3] nor did he prepare a written report or recommendation regarding the incident.

## I

To avoid later confusion, it is important to state first what this case is *not* about. It is not about a situation where the police do not respond to an urgent call from a citizen who is in immediate danger of being harmed. In this case, on both occasions the police responded to the requests of Garnett Morgan. Her first request to the police captain was that he speak to her husband in an effort to "keep him away from me" because of the violent threats her husband, a police officer, had made to her. The police complied with this request.

Several months later, the next request was for police aid due to the violence her husband had perpetrated on her and the danger she felt she was then in. The police complied with her request promptly and, when the tragic shootings occurred, the police lieutenant was in the act of arresting her husband—who then briefly eluded the lieutenant by the ruse of returning his children to his wife and perpetrated the shootings.

One may, therefore, rule out in the beginning any notion that this case brings into play other decisions where the police abandon someone in distress or in immediate danger. Here, on both occasions the requests made of the police by Garnett Morgan were complied with promptly. The only genuine question is whether the police should have done more and, not having done more, whether this had, as a matter of law, an attributable relation to the injuries such as to cause responsibility on the part of the city government for damages resulting from the shootings.

## II

 Over a century ago, the Supreme Court enunciated a rule which remains the law: law enforcement officials and, consequently, state governments generally may not be held liable for failure to protect individual citizens from harm caused by criminal conduct. *South v. Maryland,* 59 U.S. (18 How.) 396, 15 L.Ed. 433 (1856); *e.g., DeHoney v. Hernandez,* 122 Ariz. 367, 372, 595 P.2d 159, 164 (1979) (en banc); *Shore v. Town of Stonington,* 187 Conn. 147, ——, 444 A.2d 1379, 1381 (1982); *Warren v. District of Columbia,* 444 A.2d 1, 3 (D.C.1981); *Crouch v. Hall,* 406 N.E.2d 303, 304 (Ind.App.1980); *Porter v. Urbana,* 88 Ill.App.3d 443, 445, 43 Ill.Dec. 610, 612, 410 N.E.2d 610, 612 (1980); *Commercial Union Ins. Co. v. City of Wichita,* 217 Kan. 44, 536 P.2d 54 (1975); *Riss v. City of New York,* 22 N.Y.2d 579, 240 N.E.2d 860, 293 N.Y.S.2d 897 (1968); *Trujillo v. City of Albuquerque,* 93 N.M. 564, 569, 603 P.2d 303 (1979); *Chapman v. City of Philadelphia,* 290 Pa.Super. 281, 283, 434 A.2d 753, 754 (1981); *Walters v. Hampton,* 14 Wash.App. 548, 543 P.2d 648 (1975); *see generally* 18 E. McQuillan, Municipal Corporations §§ 53.04a, b (3d ed. 1977); Note, *Police Liability for Negligent Failure to Prevent Crime,* 94 Harv.L.Rev. 821 (1981) [hereinafter cited as *Police Liability*]; Annot., 46 A.L.R.3d 1084 (1972). *But cf. Stewart v. Schmieder,* 386 So.2d 1351, 1358 (La.1980); *Coffey v. City of Milwaukee,* 74 Wis.2d 526, 534, 247 N.W.2d 132, 137–38 (1976). The rule embodies a doctrine differentiating between public and private duties:

[I]f the duty which the official authority imposes upon an officer is a duty to the public, a failure to perform it, or an

---

**3.** As stated, he conducted an inquiry by discussing the incident complained of by Morgan's wife with Officer Morgan and Lieutenant Swank, his superior, pursuant to her request, and then phoned her to report to her and offer his advice.

inadequate or erroneous performance, must be a public and not an individual injury, and must be redressed, if at all, in some form of public prosecution. On the other hand, if the duty is a duty to the individual, then a neglect to perform it, or to perform it [im]properly, is an individual wrong and may support an individual action for damages.

2 COOLEY, TORTS § 300 at 385–86 (4th ed. 1932) (citation and footnotes omitted). A duty to protect individuals from criminal conduct "is a public duty, for neglect of which the officer is amenable to the public, and punishable by indictment only." *South v. Maryland, supra,* 59 U.S. at 403; *see Warren v. District of Columbia, supra,* 444 A.2d at 4; *Shore v. Town of Stonington, supra,* 187 Conn. at ——, 444 A.2d at 1381–82; *Crouch v. Hall, supra,* 406 N.E.2d at 304–05.

In recent years, municipalities have experienced a rash of lawsuits aimed at holding public officials at various levels of supervisory responsibility accountable for torts committed during the course of their duties. As a reulst, courts have had occasion to consider, and to reaffirm, the various policies which have led the law to determine that the duty to prevent crime is a general duty owed to the public and, therefore, unenforceable by any one individual. *Shore v. Town of Stonington, supra,* 187 Conn. at ——, 444 A.2d at 1382 (discussing relation of duty to policy); *see* W. PROSSER, TORTS § 53 (4th ed. 1972) (concept of duty expresses "sum total" of policy considerations). Foremost is the practical realization that individuals, juries and courts are ill-equipped to judge "considered legislative-executive decision[s]" as to how particular community resources should be or should have been allocated to protect individual members of the public. *Riss v. City of New York, supra,* 22 N.Y.2d at 579, 240 N.E.2d at 860, 293 N.Y.S.2d at 897; *see* Jaffe, *Suits Against Governments and Officers: Damage Actions,* 77 HARV.L.REV. 209, 237 (1963) ("court cannot undertake to determine whether complex governmental decisions are 'reasonable'"). Severe depletion of these resources could well result if every oversight, omission or blunder made by a police official rendered a state or municipality potentially liable in compensatory, let alone punitive damages. *Massengill v. Yuma County,* 104 Ariz. 518, 523, 456 P.2d 376, 381 (1969) (en banc). In effect, police officials would be placed in the position of insuring the personal safety of every member of the community, notwithstanding limited resources and the inescapable choices of allocation that must be made. *See Porter v. Urbana, supra,* 88 Ill.App.3d at 446, 43 Ill.Dec. at 612, 410 N.E.2d at 612; *Walters v. Hampton, supra,* 14 Wash.App. at 554, 543 P.2d at 652 (city cannot be made "insurer" against every harm posed by criminal act). Moreover, police officials who act and react in the milieu of criminal activity where every decision to deploy law enforcement personnel is fraught with uncertainty must have broad discretion to proceed without fear of civil liability in the "unflinching discharge" of their duties. *Gregoire v. Biddle,* 177 F.2d 579, 581 (2d Cir.1949). As the Connecticut Supreme Court recognized, the public interest is not served "by allowing a jury of lay [persons] with the benefit of 20/20 hindsight to second-guess the exercise of a police [officer]'s discretionary professional duty. Such discretion is no discretion at all." *Shore v. Town of Stonington, supra,* 187 Conn. at ——, 444 A.2d at 1384.

Other practical considerations come to bear at the level of day-to-day law enforcement. If the police were held to a duty enforceable by each individual member of the public, then every complaint—whether real, imagined, or frivolous—would raise the spectre of civil liability for failure to respond. Rather than exercise reasoned discretion and evaluate each particular allegation on its own merits the police may well be pressured to make hasty arrests solely to eliminate the threat of personal prosecution by the putative victim. *Porter v. Urbana, supra,* 88 Ill.App.3d at 445, 43 Ill.Dec. at 612, 410 N.E.2d at 612. Such a result historically has been viewed, and rightly so, as untenable, unworkable and unwise. Fur-

thermore, other effective mechanisms exist to control the behavior of errant police officials. Internal Metropolitan Police Department disciplinary proceedings, for example, provide a forum whereby individual officials may be held accountable for dereliction of duty, D.C.Code § 4–117 (1981), and officers who fail to arrest law breakers face formal criminal prosecution with the potential for two years' imprisonment. D.C.Code § 4–142 (1981); *see Warren v. District of Columbia, supra,* 444 A.2d at 8. Realistically speaking, while public prosecution does little to console those who suffer from the mistakes of police officials, on balance the community is better served by a policy that both protects the exercise of law enforcement discretion and affords a means of review by those who, in supervisory roles, are best able to evaluate the conduct of their charges.

██ In narrow situations, however, the no-liability rule does not apply. Where a "special relationship" exists between the police and a particular individual, a specific legal duty may be created rendering the police liable for failure to act. *Warren v. District of Columbia, supra,* 444 A.2d at 3; *see Police Liability, supra* at 824 ("courts universally recognize a duty when a 'special relationship' exists between the plaintiff and the police"); *see generally* McQUILLAN, *supra* at § 53.04b. Although the police have no obligation to act at the behest of any one individual, once they begin to act on behalf of a particular citizen in such a way as to raise significantly the quotient of risk over and above the risks assumed by every other member of the community, additional responsibilities arise. In the words of then Judge Cardozo:

> The hand once set to a task may not always be withdrawn with impunity though liability would fail if it had never been applied at all .... If conduct has gone forward to such a stage that inaction would commonly result, not negatively merely in withholding a benefit, but positively or actively in working an

injury, there exists a relation out of which arises a duty to go forward.

*H.R. Moch Co. v. Rensselaer Water Co.,* 247 N.Y. 160, 167, 159 N.E. 896, 898 (1928). Determining when a special relationship exists between the police and an individual is the inquiry to which we now turn.

Analysis begins by considering the boundaries of the exception. A special relationship undoubtedly exists where an individual assists law enforcement officials in the performance of their duties. In *Schuster v. City of New York,* 5 N.Y.2d 75, 154 N.E.2d 534, 180 N.Y.S.2d 265 (1958), plaintiff's intestate supplied the police department with information leading to the arrest of Willie Sutton, a dangerous fugitive and a criminal of infamous reputation. Immediately thereafter, plaintiff's intestate received various threats against his life and notified the police, but they refused to provide protection on his behalf. Three weeks later he was shot and killed while walking home one evening. Carving out an exception to the no-liability rule, the New York Court of Appeals held that a municipality "owes a special duty to use reasonable care for the protection of persons who have collaborated with it in the arrest or prosecution of criminals, once it reasonably appears that they are in danger due to their collaboration." *Id.* at 80–81, 154 N.E.2d at 537, 180 N.Y. S.2d at 269. Other courts have similarly upheld municipal liability where the police affirmatively engage the assistance of a particular individual and then fail to protect him. *See Swanner v. United States,* 309 F.Supp. 1183 (M.D.Ala.1970) (duty to protect informant endangered because of aid to federal law enforcement officials); *Gardner v. Village of Chicago Ridge,* 71 Ill.App.2d 373, 219 N.E.2d 147 (1966) (liability upheld where police failed to protect witness summoned to make identification); *Christy v. City of Baton Rouge,* 282 So.2d 724 (La.App.1973) (liability for failure to protect citizen assisting in arrest).

The theory of these decisions stems in part from a concern that failure to impose a duty of protection would discourage citizens

from cooperating with law enforcement officers. *Schuster v. New York, supra,* 5 N.Y.2d at 81, 154 N.E.2d at 537, 180 N.Y. S.2d at 269. More importantly, imposing a duty of care in these situations does not interpose the judgment of a jury for the discretion of the police. Rather, where the police make "active use" of a private citizen in the investigation, arrest, or prosecution of a criminal, the police, of their own accord, decide to go forward and in fact do. *Id.* at 82–83, 154 N.E.2d at 538, 180 N.Y. S.2d at 271; *see Gardner v. Village of Chicago Ridge, supra,* 71 Ill.App.2d at 379–80, 219 N.E.2d at 150. Having exercised discretion and chosen to act, the police thereby voluntarily assume a duty to proceed with reasonable care to protect individuals whom they have particularly placed in peril by making use of their assistance. *See Police Liability, supra* at 825–26; *see generally* PROSSER, *supra* at 338–39 (courts reluctant to force individuals to act but once action undertaken liability follows for failure to act reasonably).

■ In contrast, a special relationship does not come into being simply because an individual requests assistance from the police. *Hartzler v. City of San Jose,* 46 Cal. App.3d 6, 120 Cal.Rptr. 5 (1975) (no duty to protect victim who informs police of imminent danger and requests help); *Doe v. Hendricks,* 92 N.M. 499, 502–503, 590 P.2d 647, 651 (1979) (no duty to victim to respond promptly to witness' call for help); *Riss v. City of New York, supra,* 22 N.Y.2d at 579, 240 N.E.2d at 860, 293 N.Y.S.2d at 897 (no duty to comply with victim's repeated request for protection from rejected suitor); *see Porter v. City of Urbana, supra,* 88 Ill.App.3d at 446, 43 Ill.Dec. at 613, 410 N.E.2d at 613 (recognizing rule). Otherwise, a police officer's general duty to the public inevitably would narrow to a special duty to protect each and every person who files a complaint with the department and attaches a request for help. Under these circumstances, the no-liability rule is particularly salutary: individual citizens are in no position to direct the discretion of police officers whose primary responsibilities must be focused broadly in attending to the safety of the public at large. A plaintiff, in short, "cannot unilaterally call into existence a special relationship." *Haehl v. Village of Port Chester,* 463 F.Supp. 845, 851 (S.D.N.Y.1978).

Nor is the situation changed when the police gratuitously promise to provide protection. *Warren v. District of Columbia, supra,* 444 A.2d at 2, 6 (police dispatcher's assurance to rape victims does not create special duty); *Henderson v. City of St. Petersburg,* 247 So.2d 23, 25 (Fla.App.1971) (police promise to provide plaintiff protection while making business deliveries does not create special duty). *Contra Morgan v. County of Yuba,* 230 Cal.App.2d 938, 41 Cal.Rptr. 508 (1964) (liability upheld where police promised to inform plaintiff of release of dangerous prisoner but did not). A promise to act adds nothing to the obligation law enforcement officers have already assumed as members of a police force guided exclusively by the public interest. Employed to protect the safety of the community—often with danger to life and limb—a police officer must have discretion to decide how and when to proceed. Reassuring a citizen victimized by criminal conduct that help is on the way certainly does not mean that at all costs the action promised inexorably must follow:

> An intention to assume an obligation of indefinite extension to [each] member of the public is . . . improbable when we recall the crushing burden that the obligation would impose . . . . A promisor will not be deemed to have had in mind the assumption of a risk so overwhelming . . . .

*H.R. Moch Co. v. Rensselaer Water Co., supra,* 247 N.Y. at 165–66, 159 N.E. at 897–98.

■ Between these boundaries are circumstances where the police do not benefit from a citizen's aid but nevertheless affirmatively act to protect a specific individual or a specific group of individuals from harm, in such a way as to engender particularized

and justifiable reliance. Illustrative is *Florence v. Goldberg,* 44 N.Y.2d 189, 375 N.E.2d 763, 404 N.Y.S.2d 583 (1978). In *Florence,* the police department assigned a school crossing guard to a busy intersection in Brooklyn. The department's rules and regulations provided that if a crossing guard were unable to report for duty, another officer would be assigned to the location or the school principal would be notified to make other arrangements for the children's safety. For the first two weeks of school, plaintiff, mother of a six and one-half year old boy in first grade, walked her son to school, a block away from their home. Each day they crossed the intersection and each day a crossing guard was present. When, two weeks after class began, she accepted an offer of employment, she did not arrange for another adult to help her child across the intersection because of the daily presence of the guard. Thereafter, a crossing guard reported sick one morning, the police department failed either to provide a replacement or to notify the school principal, and the child was hit by a taxicab while attempting to cross the intersection.

The New York Court of Appeals sustained the plaintiff's cause of action against the city, emphasizing two factors. First, in assigning a crossing guard to the intersection, the police voluntarily assumed a duty, not to the general public, but to "a special class of persons—*viz.,* children crossing designated intersections while traveling to and from school at scheduled times." *Id.* at 196–97, 375 N.E.2d at 767, 404 N.Y.S.2d at 587. Supporting this conclusion were the department's own regulations, specifically setting forth the procedures to be followed for the effective supervision of crosswalks. Second, the child's mother had "reason to rely," and particularly did rely, on the presence of a crossing guard at the intersection; a guard had been there each day she brought her child to school and she would

not otherwise have allowed her son to walk back and forth alone. *Id.*

Other courts have applied similar reasoning in fashioning the special relationship exception, emphasizing the requisites of (1) a specific undertaking to protect a particular individual, and (2) justifiable reliance by the plaintiff. As in *Florence* (where the police in fact provided a school crossing guard), whether there exists an affirmative undertaking to protect a particular individual turns upon law enforcement actions rather than representations. *See Silverman v. City of Fort Wayne,* 171 Ind. App. 415, 357 N.E.2d 285 (1976) (where police provided, then withdrew protection of plaintiff's property from riot damage, special relationship may exist); *Bloom v. City of New York,* 78 Misc.2d 1077, 1078, 357 N.Y.S.2d 979, 981 (1974) (police positively restrained plaintiffs from obtaining alternative safeguards for premises following assurance that protection would be provided —"an affirmative series of acts by which the city assumed a special duty");[4] *see Chapman v. City of Philadelphia, supra,* 290 Pa.Super. at 283, 434 A.2d at 754 (special relationship only where "authorities have undertaken the responsibility to provide adequate protection" for individual). In addition, a statute or regulation may describe a special duty to a particular class of individuals. Again as in *Florence* (where police directives specifically provided procedures to be followed in supervising school crossing guards), the language of the statute or regulation must set forth "mandatory acts clearly for the protection of a particular class of persons rather than the public as a whole." *Cracraft v. City of St. Louis Park,* 279 N.W.2d 801, 807 (Minn.1979); *see State v. Superior Court of Maricopa County,* 123 Ariz. 324, 332–33, 599 P.2d 777, 785–86 (1979) (en banc); *Stewart v. Schmieder, supra,* 386 So.2d at 1358; *Gordon v. Holt,* 65

---

**4.** The author of *Police Liability, supra* at 826, cites these two decisions for the proposition that law enforcement officers who promise to provide protection have a duty to carry out that promise. A fair reading of these cases, however, indicates that in each, the conduct, rather than the statements of the police, controlled the special relationship determination.

A.D.2d 344, 350–51, 412 N.Y.S.2d 534, 538 (1979).

■ The second element required to establish a special relationship is justifiable reliance, by the plaintiff, upon the actions of the police. Justifiable reliance, in this context, means particular or special reliance. *Haehl v. Village of Port Chester, supra,* 463 F.Supp. at 851; *see Florence v. Goldberg, supra,* 44 N.Y.2d at 196–97, 375 N.E.2d at 767, 404 N.Y.S.2d at 587; *see generally DeHoney v. Hernandez, supra,* 122 Ariz. at 367, 595 P.2d at 164; *Gordon v. Holt, supra,* 65 A.D.2d at 351, 412 N.Y.S.2d at 538; *cf. Morgan v. County of Yuba, supra,* 230 Cal.App.2d at 944, 41 Cal.Rptr. at 512. The definition could not be otherwise. In a civilized society, every citizen at least tacitly relies upon the constable for protection from crime. Hence, more than general reliance is needed to require the police to act on behalf of a particular individual. The plaintiff must specifically act, *see Florence v. Goldberg, supra,* 44 N.Y.2d at 197, 375 N.E.2d at 767, 404 N.Y.S.2d at 587 (plaintiff discontinued walking son to school, having "reason to rely" on presence of crossing guard), or refrain from acting, *see Bloom v. City of New York, supra,* 78 Misc.2d at 1078, 357 N.Y.S.2d at 981 (plaintiff restrained by police from providing own safeguards for property), in such a way as to exhibit particular reliance upon the actions of the police in providing personal protection. Liability is established, therefore, if the police have specifically undertaken to protect a particular individual and the individual has specifically relied upon the undertaking.

■ The theory of this exception to the no-liability rule parallels the rationale of the law enforcement assistance cases. Undertaking to protect a particular individual is an action necessarily preceded by a police officer's decision to act, which is itself an exercise of discretion. Neither a court nor a jury interferes with this decision; rather, review is limited to a determination of whether reasonable care was exercised when, and only when, the police have affirmatively gone forward. The additional element of particular reliance further serves to place law enforcement officials on notice as to the foreseeable consequences of failure to exercise reasonable care, not unlike the knowledge that a citizen employed in law enforcement efforts must be protected from harm. Thus, requiring a specific undertaking to protect a particular individual together with special reliance on the plaintiff's part in order to create a special relationship facilitates dual policies of preserving police discretion while enhancing responsiveness to individuals particularly placed in peril, by police conduct.

■ Absent a special relationship, therefore, the police may not be held liable for failure to protect a particular individual from harm caused by criminal conduct. A special relationship exists if the police employ an individual in aid of law enforcement, but does not exist merely because an individual requests, or a police officer promises to provide protection. Where the police by their actions affirmatively undertake to protect an individual under circumstances creating a special relationship or there is a statute or regulation which mandates protection of a particular class, and where the individual justifiably relies upon such undertaking of the police, or the statute or regulations, the special relationship is sufficient to support a finding of liability.[5] We now turn to apply these principles.

---

**5.** In narrow circumstances, a special relationship may also be established by a course of conduct between the plaintiff and the municipality strongly indicating the need for police protection. *See Warren v. District of Columbia, supra,* 444 A.2d at 3; *Cady v. State,* 129 Ariz. 258, 263, 630 P.2d 554, 559 (Ariz.App. 1981); *see generally Jones v. County of Herkimer,* 51 Misc.2d 130, 272 N.Y.S.2d 925, 932 (1966); *Baker v. City of New York,* 25 A.D.2d 770, 269 N.Y.S.2d 515, 518 (1979). In *Baker,* for example, the police refused to enforce a protection order obtained by the plaintiff against her estranged husband, a former law enforcement officer who had been diagnosed by a court psychiatrist as destructive. A probation officer with the Domestic Relations Court also refused to protect the plaintiff when

## III

■ The duty of the Metropolitan Police Department to protect the citizens of the District of Columbia from crime is a public duty, unenforceable by any one individual. Thus, as a general principle, the District of Columbia is not liable for the injury· to Garnett Morgan arising from the criminal conduct of her husband. *South v. Maryland, supra,* 59 U.S. (18 How.) at 403; *Warren v. District of Columbia, supra,* 444 A.2d at 3; *see* McQUILLAN, *supra* at § 53.04a. Indeed, the circumstances here uniquely illustrate the policies underlying the no-liability rule. Laid bare, the facts indicate that a police officer's wife, Garnett Morgan, contacted a police captain, Tiernan, and reported that her husband, an officer who had carried his service revolver on and off duty [6] for five years without incident, had assaulted her with the weapon the night before. In responding to this complaint arising not from a crime involving strangers on the street but from an apparent marital dispute between one of his officers and the officer's wife, Captain Tiernan had certain options. He could have immediately disarmed Officer Morgan on the basis of his wife's assertion. This measure, however, would realistically remove him from the force. Tiernan could have conducted a full-scale formal investigation, filed a report to his supervisors, or arranged for a hearing held before a board of police officials. Or Captain Tiernan could have considered the context of the offense and have done what Morgan's wife actually requested him to do, *i.e.,* contact Morgan himself in order to keep him "away from [her]."

■ From any of these options Captain Tiernan had to decide how to proceed, and in so deciding, had to call upon his experience and training during his years on the force in dealing with complaints of misconduct in a police officer's personal life. In a word, Captain Tiernan had to exercise *discretion,* and the law, through the no-liability rule, protects and preserves his role in the decisionmaking process. The law leaves a police official free to decide how to proceed by affording him the knowledge that, unless he specifically undertakes responsibility to ensure the safety of a particular individual, his omissions, oversights, and errors in evaluating each. circumstance will not be considered the cause of harm to citizens whom he has pursued a career to protect. *Porter v. City of Urbana, supra,* 88 Ill.App.3d at 445, 43 Ill.Dec. at 612, 410 N.E.2d at ·612. Nor will a jury of lay persons be permitted, in hindsight, to second-guess what he should or should not have done. *Shore v. Town of Stonington, supra,* 187 Conn. at ——, 444 A.2d at 1384. The question is whether Captain Tiernan did affirmatively undertake the obligation of protecting Garnett Morgan, thereby creating a special relationship between her and the police. On this record, we hold that he did not.

Garnett Morgan specifically asked Captain Tiernan if he "would just make [her husband] stay away from me." She did not want the police to come to her house; nor did she want to file a complaint against her husband. She called "asking for [Tiernan's] assistance with my husband, and just to ask him to stay away from me." Captain Tiernan said that while he could not "put a man out of his own house," he would speak with her husband and call her back. Mrs. Morgan stated:

> So he told me if I wanted to file a formal complaint against him, you know, that was something different but then, later,

she arrived at his office shortly thereafter and asked to wait inside for her husband; forced to the waiting room, she was then shot by her husband upon his arrival. According to the New York court, "Plaintiff was thus singled out by judicial process as a person in need of special protection and peace officers had a duty to supply protection to her." *Baker v. City of*

*New York, supra,* 25 A.D.2d at 772, 269 N.Y. S.2d at 518.

While *Baker* may indicate a proper application of the "course of conduct" exception to the no-liability rule, the open-ended nature of the phrase suggests that it be narrowly construed.

**6.** Police regulations require an officer to carry his gun at all times.

something else happened. He told me that it would be different with the formal complaint. . . . He said that was something different. I—when I called him, I was asking for his assistance with talking with my husband, and just to ask him to stay away from me.

Mrs. Morgan at no time lodged a written statement concerning her husband's conduct with the Maryland (where she lived) or District of Columbia authorities, notwithstanding Captain Tiernan's statements to her. Tiernan then contacted Morgan's immediate supervisor, Lieutenant Swank, and together they met with Morgan. Tiernan told Morgan that "if he couldn't get along with his wife . . . he should leave." Tiernan then called Garnett Morgan and told her that he had "explained some things to" her husband and advised her that "maybe it would be best if [they] just separated." A few days later she rented an apartment, telephoned Tiernan asking assurance that her husband was at work while she left, and moved out. Three months later, the events culminating in the injuries to Garnett Morgan and the Pinkney family occurred.

Plainly, Garnett Morgan did not ask Captain Tiernan to protect her by disarming her husband, with the necessary result of effectively suspending him from the police force. Even if she had, this would not suffice to create a special relationship between her and the police. *Hartzler v. City of San Jose, supra,* 46 Cal.App.3d at 9–10, 120 Cal.Rptr. at 7; *Doe v. Hendricks, supra,* 92 N.M. at 502–503, 590 P.2d at 651; *Riss v. City of New York, supra,* 22 N.Y.2d at 579, 240 N.E.2d at 860, 293 N.Y.S.2d at 897. Rather, she rejected the idea that a police officer come to their home and refused to file a complaint. Instead, she asked Captain Tiernan simply to talk with her husband. Nor did Captain Tiernan promise to protect Garnett Morgan; and even if he had, failure to protect her would not support a finding of liability. *Warren v. District of Columbia, supra,* 444 A.2d at 2, 6; *Henderson v. City of St. Petersburg, supra,*

247 So.2d at 25. In short, these facts indicate just this: at the request of an officer's wife for "assistance" in facilitating some type of separation from her husband—by asking him to stay away from her—a police captain discussed the problem with the officer. Without further action affirmatively indicating an intent to deploy the police department to assure her safety, Captain Tiernan did not undertake, and was not requested, to guard Garnett Morgan from possible future harm. *See Florence v. Goldberg, supra,* 44 N.Y.2d at 196–97, 375 N.E.2d at 767, 404 N.Y.S.2d at 587; *Silverman v. City of Fort Wayne, supra,* 171 Ind.App. at 417, 357 N.E.2d at 286. As a result, Captain Tiernan had broad discretion to address these circumstances. He was free to consider that, according to Swank, Morgan and his wife had fought for a number of years without involvement of a gun, *cf. Riss v. City of New York,* 27 App.Div.2d 217, 278 N.Y.S.2d 110 (no liability where "complaints continued over a considerable period without active implementation by dangerous conduct"), *aff'd,* 22 N.Y.2d 579, 240 N.E.2d 860, 293 N.Y.S.2d 897 (1967); he was also free to consider, again according to Swank, that Morgan's personnel file did not indicate a history of violent conduct. *See supra note* 1. In any event, without the police having assumed a duty to protect Garnett Morgan, Tiernan's actions are beyond reach in this litigation.

■ Nor do the police department's "general orders," which require an investigation, report and recommendation whenever an improper use of an officer's service revolver is reported, establish a duty to protect Garnett Morgan. Aside from whether Captain Tiernan did or did not substantially comply with them, the orders, according to his testimony,[7] apply when *any member* of the public files such a report. Thus, the language of these directives indicates procedures for the protection not specifically of police officers' spouses, but of the public in general. As a result, no special relationship between the police and a

---

**7.** The only evidence of these orders was introduced through Captain Tiernan's testimony.

particular class of which Garnett Morgan is a part was created. *See Cracraft v. City of St. Louis Park, supra,* 279 N.W.2d at 807; *State v. Superior Court of Maricopa County, supra,* 123 Ariz. at 332–33, 599 P.2d at 785–86; *Stewart v. Schmieder, supra,* 386 So.2d at 1358.

■ Finally, Garnett Morgan did not particularly rely upon Captain Tiernan to protect her. On the contrary, of her own accord she moved out of her home into an apartment, changing her telephone number and concealing her new address from her husband. When she called Tiernan prior to leaving, she did not ask him to detain her husband at the precinct, but sought only to know if he was there. Hence, there was not in any way, special reliance upon the police for protection. *See Haehl v. Village of Port Chester, supra,* 463 F.Supp. at 851; *Florence v. Goldberg, supra,* 44 N.Y.2d at 196–97, 375 N.E.2d at 767, 404 N.Y.S.2d at 587.

■ There is the added consideration that even if we were to hold that even though he complied with all her requests, Captain Tiernan had a greater duty to protect Garnett Morgan from her husband, Tiernan's actions were not, as a matter of law, the proximate cause of her injuries. A defendant may not be held liable for harm actually caused where the chain of events leading to the injury appears "highly extraordinary in retrospect." *Lacy v. District of Columbia,* 424 A.2d 317, 320–21 (D.C.1980). John Morgan was not merely a private employee carrying a dangerous instrumentality at the behest of his employer, but rather, an experienced and trained Metropolitan Police Department Officer who had carried his service revolver for five years without incident. During these years on the force, Morgan had no record of violent conduct. *See supra* note 1. Moreover, Morgan and his wife had been embroiled in marital disputes over the course of the previous two years without involvement of a shooting—even though Morgan carried or had immediate access to his gun at all times. *See supra* note 5. Finally, after the assault,

Garnett Morgan no longer lived with her husband but moved into an apartment with her children, and for the three months following the incident, lived in peace. That Officer Morgan would, three months later, show up on her doorstep and subsequently shoot her while being taken into police custody—after not having done so during the previous two years of marital arguments nor having wrongfully fired his weapon during five years on the force—describes a chain of events that is, in retrospect, highly extraordinary. *Id.*

It is significant that the shootings occurred during his arrest. It was his arrest that triggered the shootings in this case. There is no serious issue on appeal, however, relating to negligence by the police in effecting the arrest of the husband.

■ The issue was not brought before the court by appellee in its opposition to appellants' response to the government's petition for rehearing en banc. In their original brief in this court, however, appellants presented a contention that the trial court erred in directing a verdict in favor of the government on the issue of negligence on the part of Lieutenant Bowles in directing two police officers from the scene prior to the shooting. The majority opinion of the hearing division expressly did not reach this issue (*see Morgan v. District of Columbia, supra,* 449 A.2d at 1113 n. 16). In directing a verdict for the defendants on this issue the trial court made these findings:

> The Court finds that, at best, plaintiff has proven that Lieutenant Bowles responded to an emergency situation at the Pinkney home and exercised his judgment regarding the proper course of action to take. There has been introduced, no evidence as to how long Lieutenant Bowles had been stationed at the Seventh District, that whether or not he personally knew former Officer Morgan. There has been no evidence as to whether he would have had occasion in his position there to know or be familiar with any of the complaints in Officer Morgan's per-

sonnel file, or that he actually did have any knowledge with respect to his prior personal history.

Plaintiff has introduced no testimony, expert or otherwise, regarding the proper course of action that policemen should take in handling what might be termed domestic situations, such as occurred here.

Lieutenant Bowles' primary concern was for the safety of the parties involved, particularly the young children, as indicated by the evidence that possibly the District's [sic] return to the home was for safety of the young children.

There is no evidence that if he had taken different action, such as sending— not sending the two officers away, then these tragic events which followed would not have occurred.

The Court finds that the plaintiff has not established a prima facie case of negligence, proximately causing injury. Therefore, a verdict is directed for the District of Columbia on plaintiff's claim regarding the actions of Lieutenant Bowles.

We agree with the trial court's assessment and conclude there is no merit to appellants' contention, which, as we have stated, was raised earlier in their brief before the hearing division of this court.

## IV

There being no general duty on the part of the Metropolitan Police Department to protect these plaintiffs and no special relationship between them, liability fails as a matter of law. The crucial circumstances in this case occurred not when Captain Tiernan spoke to Garnett Morgan or to her husband, but at the time of the tragic shootings which gave rise to the claim for damages upon which this case is founded. The police immediately responded to Garnett Morgan's request for assistance and a lieutenant and two officers arrived on the scene to apprehend her husband. Unfortunately, due to a ruse by her husband, he avoided apprehension by the Lieutenant un-

til after the shootings occurred. For these reasons, the injuries to plaintiffs are not attributable to the District of Columbia.

Accordingly, the judgment on appeal is

*Affirmed.*

FERREN, Associate Judge, with whom NEWMAN, Chief Judge, MACK, Associate Judge, and KELLY, Associate Judge, Retired, join, dissenting:

The majority concludes that, absent "a 'special relationship' . . . between the police and a particular individual" that creates "a specific legal duty . . . rendering the police liable for failure to act," *ante* at 1312, "the police may not be held liable for failure to protect a particular individual from harm caused by criminal conduct." *Ante* at 1315. Because the majority finds no such special relationship here, the court holds that appellants may not recover for the Metropolitan Police Department's negligent failure to prevent the murder of Elton Pinkney and the gunshot injuries to Garnett Morgan and her son, John Keith Morgan.

While this court has applied the quoted principle in ordinary cases of failure to respond to citizen complaints, *see, e.g., Warren v. District of Columbia,* 444 A.2d 1 (D.C.1981) (en banc), that principle, in my view, is not properly applicable to this case. The negligence complained of here was the police department's failure to exercise proper supervision over a member of the force, not failure to investigate or prevent crimes by civilians. As discussed in the division opinion, *Morgan v. United States,* 449 A.2d 1102, 1108 (D.C.1982), the legal duty at issue here is not a special duty, *i.e.,* a duty dependent on a "special relationship." Rather, it

is properly characterized as a general duty, owed to the public at large, to use reasonable care in supervising and controlling police officers and their service revolvers. *Marusa v. District of Columbia,* 157 U.S.App.D.C. 348, 351, 484 F.2d 828, 831 (1973) ("government has a duty

to minimize the risk of injury to members of the public that is presented by [its] policy [of requiring police officers to carry service revolvers at all times]"); *Carter v. Carlson,* 144 U.S.App.D.C. 388, 398, 447 F.2d 358, 368 (1971) ("District of Columbia as a corporate entity has a duty to supervise, train and control its police officers"), *reversed in part, sub nom. District of Columbia v. Carter,* 409 U.S. 418, [93 S.Ct. 602, 34 L.Ed.2d 613] (1973); *see District of Columbia v. White,* D.C.App., 442 A.2d 159 (1982) (referring to existence of cause of action against police department for negligent supervision of officers); *District of Columbia v. Davis,* D.C.App., 386 A.2d 1195, 1199–1201 (1978) (same). [Footnote omitted.]

The majority's "special relationship" or "special duty" analysis is therefore irrelevant. A jury applying the proper standard of reasonable care under the circumstances to Captain Tiernan's supervisory efforts could reasonably have found negligence. *Id.* at 1109.

The majority also concludes that Captain Tiernan's failure to follow established procedures after Garnett Morgan told him of appellant John Morgan's gun threat did not, as a matter of law, proximately cause the death and injuries. To the contrary, a jury reasonably could find that, far from being "highly extraordinary in retrospect," *ante* at 1318,[1] "it was reasonably foreseeable under circumstances known to the Department that Morgan 'might avail himself of the opportunity' to carry out his threat with the gun" if his superior officers did not take reasonable steps to assess and minimize that risk. *Id.* at 1113, *quoting* RESTATEMENT (SECOND) OF TORTS § 448 (citations omitted).

Respectfully, therefore, I dissent for the reasons more fully set forth in the vacated division opinion. *Morgan, supra,* 449 A.2d at 1102. The trial court erred in granting judgment notwithstanding the verdicts. I would reinstate the jury verdicts as to all appellants.

---

1. In its discussion of proximate cause, the en banc court quotes from and confirms the correctness of the test for proximate cause set forth in the RESTATEMENT (SECOND) OF TORTS § 435 and applied by the division majority. See *ante* at 1318; *Morgan, supra,* 449 A.2d at 1110–11; *Lacy v. District of Columbia,* 424 A.2d 317, 319–21 (D.C.1980).