# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 21, 2011          Decided July 17, 2012

No. 11-7001

ALEXANDRIA MCGAUGHEY,
APPELLANT

v.

DISTRICT OF COLUMBIA, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:07-cv-01498)

———

*Bruce V. Spiva* argued the cause for appellant. With him on the briefs were *Catherine A. Bendor* and *Susan L. Tiedemann*.

*Martina E. Vandenberg* was on the brief for *amicus curiae* D.C. Rape Crisis Center, et al. in support of appellant.

*Mary L. Wilson*, Senior Assistant Attorney General, Office of the Attorney General for the District of Columbia, argued the cause for appellees. With her on the brief were *Irvin B. Nathan*, Attorney General, *Todd S. Kim*, Solicitor General, and *Donna M. Murasky*, Deputy Solicitor General.

*James P. Gleason Jr.* and *Robert W. Goodson* entered appearances.

Before: SENTELLE, *Chief Judge*, GRIFFITH, *Circuit Judge*, and SILBERMAN, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* GRIFFITH.

GRIFFITH, *Circuit Judge*: Alexandria McGaughey claims the Metropolitan police were negligent in the way they responded to her fears that she was sexually assaulted. The district court granted summary judgment against her claims on the ground that the police owed her no duty of care. For the reasons set forth below, we affirm the judgment of the district court.

I

Because the case arises on appeal from summary judgment, the district court had of course entered no findings of fact. Therefore, the following recitation is taken from the complaint of the plaintiff and does not represent any conclusion concerning the truth or accuracy of any part.

While at a party in the early morning hours of December 9, 2006, McGaughey, then a nineteen-year-old college student, became separated from her friends. When they eventually found her, she was disoriented and looked disheveled. Soon she began vomiting and lapsed in and out of consciousness. Greatly concerned for McGaughey's well-being, her friends immediately took her to the emergency room at Howard University Hospital (HUH) and told the doctor and nurse on call that they feared she had been drugged and raped. The doctor refused to examine McGaughey until she was coherent and told her friends to

bring her back to the hospital after she had gotten some sleep. Her friends took her home.

McGaughey awoke later that morning in pain and with no memory of the events of the previous night. When told by a friend what had happened, McGaughey and her friend returned to the emergency room at HUH and informed the nurse about the suspected drugging and rape. The hospital summoned the Metropolitan police. When an officer arrived he spoke with McGaughey and her friend. Following police protocols, the officer then called a detective in the Sexual Assault Unit of the Metropolitan Police Department who, after speaking with McGaughey on the phone, determined that no further investigation was warranted and that there was no reason for the hospital to conduct the forensic exam that the police typically use to collect evidence of a sexual assault.

A word of explanation about this exam is needed. In conjunction with HUH and the D.C. Rape Crisis Center, the Metropolitan Police Department created a Sexual Assault Nurse Examiners (SANE) Program that provides for police training of hospital personnel in how to administer a forensic exam to collect and preserve evidence to aid police investigation of sexual assaults. *See* Metropolitan Police Department Special Order, Sexual Assault Nurse Examiners Program (Apr. 2, 2001). SANE procedures provide that when the police determine that a sexual assault has likely occurred, they ask the victim to undergo a forensic exam at the hospital. If the victim agrees, the police provide the nurse with the information needed to conduct the exam and, if necessary, an evidence collection kit. After the exam is completed, the police pick up the evidence and deliver it to the crime lab.

After the police left the hospital, McGaughey's sister arrived. Upon learning what had happened, she called the 911

operator. Following a long wait and a second 911 call, two other police officers arrived. They spoke with McGaughey, then called the Sexual Assault Unit, only to have another detective decide that the police would neither ask the hospital to collect evidence from McGaughey nor conduct an investigation of the alleged rape. McGaughey and her sister then spoke to a doctor and another nurse, this one specially trained in the collection of evidence from sexual assault victims. Both said they could not perform a forensic exam without police authorization, but the doctor did perform a physical examination of McGaughey, test her for pregnancy, and prescribe medications.

Frustrated with her experience at HUH, McGaughey went to the emergency room at George Washington University Hospital (GWUH) seeking someone who would conduct a forensic exam. She told a nurse there that she had been drugged and raped but that HUH would not administer a forensic exam. The nurse called the police who told her that McGaughey's case was closed and that she could not receive the police-sponsored forensic exam. Eventually, McGaughey was treated by a physician and a medical resident at GWUH, but neither collected any evidence.

McGaughey sued the District of Columbia, HUH, GWUH, and individual doctors at both hospitals. Against the District she lodged three claims, each sounding in negligence: that the police failed to take reasonable steps to investigate her allegations of a sexual assault; that the District was negligent in the way it went about hiring, training, and supervising police personnel who investigate sexual assaults; and that the police were negligent in preventing the hospitals from giving her a forensic exam. McGaughey sought compensatory and punitive damages for her physical and emotional injuries and the lost opportunity to identify and

prosecute her assailant. She also sought an injunction requiring the Metropolitan police to investigate her sexual assault and to handle other sexual assault cases correctly going forward.

The district court had supplemental jurisdiction over McGaughey's common law claims under 28 U.S.C. § 1367(a) because her claim that HUH violated the Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd *et seq.*, is part of the same case or controversy. The court granted the District summary judgment against McGaughey on all three negligence claims, holding each barred by the public duty doctrine. *McGaughey v. District of Columbia*, 734 F. Supp. 2d 14, 20-21 (D.D.C. 2010). That decision is now before us on appeal. McGaughey's claims against the hospitals and doctors remain pending below and are not relevant to the issues presented here. We have jurisdiction over this appeal under 28 U.S.C. § 1291, and apply the common law of the District of Columbia to McGaughey's negligence claims, *see Bird v. Lewis & Clark College*, 303 F.3d 1015, 1023 (9th Cir. 2002). We review a district court's entry of summary judgment de novo. We will affirm the district court if, viewing all the evidence in the light most favorable to McGaughey, "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." *McCready v. Nicholson*, 465 F.3d 1, 7 (D.C. Cir. 2006) (quoting FED. R. CIV. P. 56(c)).

II

Although McGaughey has preserved each of her negligence claims on appeal, she has not vigorously pressed two of them before us. For good reason. Her claims that the police negligently failed to investigate her sexual assault and that the District was negligent in the way it hired, trained, and

supervised police in how to investigate sexual assaults are clearly precluded by the public duty doctrine.

The public duty doctrine has long protected municipalities from negligence claims because it establishes that "[t]he duty to provide public services is owed to the public at large," not to any specific individual. *Warren v. District of Columbia*, 444 A.2d 1, 3 (D.C. 1981) (en banc). The rationale is straightforward: Courts and juries are ill-equipped to review legislative and executive decisions about how to allocate limited municipal resources to best protect the public. *See Morgan v. District of Columbia*, 468 A.2d 1306, 1311 (D.C. 1983). And because police must often make split-second decisions in the face of uncertainty and danger, the doctrine recognizes they need broad discretion to act without fear that a jury will second-guess their judgment with the 20/20 vision of hindsight. *Id.* If the police owed an enforceable duty to each person, then "every complaint — whether real, imagined, or frivolous — would raise the spectre of civil liability for failure to respond." *Id.* The doctrine, however, is no license for carelessness. There are sufficient mechanisms to control the behavior of errant police, including internal disciplinary procedures and criminal prosecution. *Id.* at 1312. We agree with the district court that McGaughey's first two claims run headlong into the public duty doctrine. *McGaughey*, 734 F. Supp. 2d at 20-21. It is clear under D.C. law that the duty to investigate crime is owed to the public, not to any specific person. *Nichol v. District of Columbia*, 444 A.2d 1, 3 (D.C. 1981) (en banc). Similar reasoning bars McGaughey's claim that failures in hiring, training, and supervising resulted in a negligent investigation. As the police have no duty to investigate any particular crime, they certainly have no enforceable duty arising from their management of the personnel who investigate the crime.

McGaughey's claim that the police breached a duty to her by preventing the hospitals from giving her a forensic exam is not so easily resolved under the public duty doctrine because it is unclear whether the police are shielded from liability when they take affirmative acts that allegedly cause harm. *Compare District of Columbia v. Evans*, 644 A.2d 1008, 1017 n.8 (D.C. 1994), *with Miller v. District of Columbia*, 841 A.2d 1244, 1248 (D.C. 2004), *Allison Gas Turbine v. District of Columbia*, 642 A.2d 841, 844-45 (D.C. 1994), *and Warren*, 444 A.2d at 3. But we need not wade into that dispute because it is clear from the record that the police did not prevent the hospitals from giving McGaughey a forensic exam. A plaintiff claiming negligence must prove not only that the defendant owed her a duty of care that was breached but that the breach proximately caused her injury. *Wash. Metro. Area Transit Auth. v. Barksdale-Showell*, 965 A.2d 16, 24 (D.C. 2009). Failure to show proximate cause is fatal to a negligence claim. *Id.*

The factual allegations support McGaughey's claim that the police told the hospitals not to conduct the police-sponsored forensic exam. Pl.'s Stmt. of Material Facts in Opp. to Defs.' Mots. for Summ. J. ¶¶ 92 (alleging the police told HUH "there would be no sexual kit done"), 99 (alleging the police told HUH that McGaughey was not a SANE patient), 110 (alleging the police told GWUH that McGaughey could not receive a SANE kit). But McGaughey concedes that nothing the police said or did kept the hospitals from conducting a functionally identical forensic exam on their own. The hospitals could have performed such an exam using equipment readily available in their emergency rooms, equipment that was not there as part of the SANE program. *Id.* ¶ 201 (explaining that "[e]ven if a hospital does not stock a sexual assault 'kit' or otherwise have one at its disposal, a [forensic exam] can be performed with materials readily

available in a hospital emergency room"). And there is no quarrel that the hospitals did not need police authorization to conduct their own exam with their own equipment. *Id.* ¶¶ 158, 160. Indeed, at oral argument, McGaughey's counsel argued that "the hospital should have done it [*i.e.*, administered a forensic exam] regardless of what the police said." Oral Arg. Tr. 21:23-24. This was the same theory that McGaughey pressed before the district court: The hospitals had an independent obligation to perform their own forensic exam quite apart from what the police may have decided should be done with the police-sponsored exam. *See* Pl.'s Stmt. of Material Facts in Opp. to Defs.' Mots. for Summ. J. ¶¶ 218, 224 (explaining that the national standard of care requires hospitals to perform forensic exams even if the police have not authorized one). Because the hospitals could have administered their own forensic exam regardless of what the police said, McGaughey's argument fails because she cannot show the police caused the harm alleged.

McGaughey argues that her concession does not end the causation inquiry. Even though the police had no authority to stop the hospitals from conducting their own exams, McGaughey alleges that they acted *as if* they did and that the hospitals complied with that command. Appellant's Br. 31; Oral Arg. Tr. 18:6-8. Once again, we need not examine the implications of that theory because nothing the police said or did can reasonably be construed to be a command that the hospitals could not use their own equipment to conduct a forensic exam on McGaughey.

The hospitals had their own authority, independent of the police, to decide whether to give McGaughey a forensic exam. McGaughey did not receive an exam because of the exercise of that authority and not because of anything that can be laid at the feet of the police.

9

III

For the foregoing reasons, the district court's grant of summary judgment in favor of the District is

*Affirmed.*