Diana **MERCED**, Plaintiff,

v.

The **CITY OF NEW YORK, and New York City Housing Authority,** Defendants.

The **CITY OF NEW YORK, Third–Party Plaintiff,**

v.

The **UNITED STATES of America, Third–Party Defendant.**

No. 90 Civ. 2898(MEL).

United States District Court, S.D. New York.

July 7, 1994.

Dienst, Serrins, Newman, O'Malley & Epstein, New York City (Kenneth I. Wirfel, of counsel), for plaintiff.

Paul A. Crotty, Corp. Counsel, New York City (Steven Levi, Asst. Corp. Counsel, of counsel), for defendant and third-party plaintiff City of New York.

Windels, Marx, Davies & Ives, New York City (Dominick Morandi, of counsel), for defendant New York City Housing Authority.

Mary Jo White, U.S. Atty., New York City (Sara L. Shudofsky, Asst. U.S. Atty., of counsel), for U.S.

LASKER, District Judge.

Diana Merced, who was shot in the face and neck by two assailants in the hallway of her Bronx public housing project, sues the City of New York and Housing Authority Police under two legal theories: (1) that the defendants violated her civil rights under 42 U.S.C. § 1983 because their failure to protect her was based on a discriminatory motive—Merced's status as a Hispanic woman and victim of domestic violence; and (2) that the defendants promised and then failed to provide protection for her, thereby breaching a duty under New York law.

New York City, in turn, sues the United States for indemnity and contribution under the Federal Tort Claims Act on the ground that the NYPD officers in question were serving as federal agents of a Joint Narcotics Task Force supervised by the United States Drug Enforcement Administration ("DEA").

New York City and the Housing Authority move separately for summary judgment but on the same grounds; first, that Merced fails to state a § 1983 claim because she has presented no evidence of a discriminatory motive and second, that Merced fails to establish that the defendants had an affirmative duty, under New York law, to protect her.

The United States moves for summary judgment dismissing the third-party com-

plaint for lack of subject matter jurisdiction and for failure to state a claim.

## I.

Diana Merced lived with confessed drug dealer Joseph Navedo and their son. Over the course of the relationship which began in 1983, Merced was the victim of Navedo's constant physical abuse and, on two occasions, her nose was broken by Navedo. In April 1987, Navedo demanded that Merced help him transport cocaine to Puerto Rico and she refused. Navedo threatened to kill her and, in a panic, Merced contacted her mother, Ramonita Merced, for help. Ramonita Merced went to the 44th Precinct in the Bronx and reported her daughter's situation to NYPD Detective Jose Arroyo.

Detective Arroyo contacted Merced and, according to her, said Navedo was "going to spend a lot of time in jail" and that she need not worry about retaliation. (Merced Deposition of May 29, 1992 at 29). Arroyo then contacted the DEA. Shortly thereafter, NYPD Detectives Bruce Rivera and Wilfred Cebollero, members of the DEA Joint Narcotics Task Force, arrested Navedo based on an outstanding warrant.

Merced alleges that she told Detective Rivera that Navedo would kill her if she cooperated with the police. She claims that Detective Rivera assured her that she could be placed in the Witness Protection Program if she was in danger (*Id.* at 41–43).

Navedo was incarcerated for three months after his arrest, but was released in July 1987 after agreeing to become an informant for the DEA. When Merced heard of his release, she contacted the NYPD about her renewed fears (Merced Deposition of May 15, 1992 at 172).

For more than a year following his release, Navedo harassed Merced and threatened to kill her. By this time, Merced was living with her mother at a Bronx public housing project. Each time Navedo tried to force himself into her apartment, Merced phoned the Housing Authority police to report that fact. Each time, Navedo left before the Housing police arrived and the Housing police told her to call again if he came back.

Merced alleges that the Housing police advised her to obtain an Order of Protection against him. As a result, Merced obtained Orders of Protection from both Bronx County Criminal Court and Family Court, dated February 14, 1988, September 22, 1988, December 22, 1988 and January 11, 1989.

After the first Order of Protection was issued, Navedo attacked Merced with brass knuckles, causing a wound which required ten stitches above her eye. After that incident, Merced went to the local NYPD precinct to file a report and present her Order of Protection. She alleges that she was told by an unidentified uniformed officer "being that me and him were ... legally husband and wife ... they really couldn't do much about it" (*Id.* at 195). On another occasion, Navedo attempted to run her over with his car. Each time, Merced called the Housing police but they did not arrest Navedo because he had left the premises. Merced states that the Housing police "knew that I had an order of protection" (*Id.* at 212).

In October 1988, Navedo attacked Merced and kidnapped their son. The Housing police then brokered a deal with Navedo, promising not to arrest him if he returned the child. During the negotiations, Merced claims that the Housing police heard Navedo threaten Merced with death. (*Id.* at 202).

Merced's mother Ramonita Merced, who was the head of the household, asked the Housing Authority in March 1989 for a change of residence to hide her family from Navedo, but the family was not moved to another apartment (*Id.* at 205).

Bronx County assistant district attorney Thomas Kapp, who handled the kidnapping complaint against Navedo, stated he was aware of Merced's Order of Protection and tried to secure protection for Merced by referring her to the Crime Victims Assistance Unit (Kapp Deposition at 18, 33).

On the morning of March 9, 1989, Merced was scheduled to testify in Bronx County Criminal Court against Navedo on the kidnapping charge, but the proceeding was postponed. That day, in the hallway of her mother's apartment building, Merced was

shot in the face and neck by two unidentified assailants.

## II.

Federal Cause of Action

The Supreme Court has held that there is no constitutional right to be protected by the government from private violence. *DeShaney v. Winnebago County Dept. of Social Services,* 489 U.S. 189, 195, 109 S.Ct. 998, 1003, 103 L.Ed.2d 249 (1989) ("as a general matter ... a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause"). The only exception which the Court specified is for persons in a state's custody.

■ However, where the failure to protect is alleged to be based on a discriminatory policy or custom, a plaintiff may state a claim against a municipality under 42 U.S.C. § 1983. *Batista v. Rodriguez,* 702 F.2d 393, 397 (2d Cir.1983), *citing Monell v. Department of Social Services of the City of New York,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

■ In support of its summary judgment motion, New York City has submitted the affidavit of Captain Jay Kopstein, Commanding Officer of the Program Liaison Section of the NYPD, which states that NYPD's policy "requires that when a police officer responds to a domestic violence situation and he/she has probable cause to believe a felony has been committed, an arrest *must* be made" (emphasis in original) (Kopstein Aff. ¶ 9). The NYPD also operates under a consent decree issued in *Bruno v. Codd,* 64 A.D.2d 582, 407 N.Y.S.2d 165 (1st Dept.1978), which mandates "equal treatment for spouses when responding to offenses defined in the Family Court Act and for violations of Orders of Protection" (Kopstein Aff. ¶ 7).

The Housing Authority, in its Patrol Guide Procedures on family offenses/domestic violence, states a "must arrest" policy for violations of Orders of Protection.

While these policy statements alone do not establish non-discrimination, the weakness of Merced's federal claim arises from the fact that nothing in the record suggests, much less proves, that the defendants discriminated on any basis. However, Merced contends that the discriminatory practice took the form of "failing to adequately train and supervise their employees in investigating and prosecuting domestic disputes."

For such a claim against a municipality to survive summary judgment, a plaintiff must present a record sufficient to suggest a failure "so grossly negligent as to constitute 'deliberate indifference.'" *Owens v. Haas,* 601 F.2d 1242, 1247 (2d Cir.1979). However, "the existence of a policy of nonsupervision amounting to deliberate indifference to constitutional rights cannot be established by inference solely from evidence of the occurrence of the incident in question ... a plaintiff cannot prevail on a § 1983 claim against a municipality without introducing other evidence." *Fiacco v. City of Rensselaer,* 783 F.2d 319, 328 (2d Cir.1986) (citations omitted) (numerous third-party complaints of police brutality, in addition to plaintiff's own allegations, established deliberate indifference and failure to supervise).

The cases Merced relies on for the proposition that a plaintiff who pleads only the facts of his or her case may pursue a § 1983 claim are inapposite because they involved motions to dismiss where the plaintiff had not yet had the opportunity to conduct discovery on the issue of pattern or practice. *See Owens v. Haas,* 601 F.2d at 1246; *Villante v. Dept. of Corrections,* 786 F.2d 516, 523 (2d Cir.1986); *Thurman v. City of Torrington,* 595 F.Supp. 1521, 1530 (D.Conn. 1984).

Although the necessary discovery has now been completed in this case, Merced has adduced no proof of discrimination against Hispanics, intentional or otherwise. Her charge of discrimination against women is premised solely on the basis that women are more often the victims of domestic violence. While that is undoubtedly true, Merced has presented no proof of other claims made by battered women that were met with indifference. Moreover, Merced's counsel stated at oral argument that no such proof would be forthcoming. Although Merced has alleged more than one instance of inaction and ap-

parent apathy on the part of city officers in her own case, that alone is insufficient to establish a discriminatory practice. Accordingly, Merced's § 1983 claim must be dismissed.

### III.

Recovery under State Law

■ In *Sorichetti v. City of New York,* 65 N.Y.2d 461, 492 N.Y.S.2d 591, 482 N.E.2d 70 (1985), the New York Court of Appeals recognized a right to recover from a municipality for its negligent failure to provide police protection where "a special relationship has been found which imposes a duty on a municipality to provide reasonable police protection to an individual." 65 N.Y.2d at 468, 492 N.Y.S.2d at 596, 482 N.E.2d at 75. In *Sorichetti,* the Court of Appeals found that a special relationship existed between the City and the plaintiff because the police knew that she had an order of protection against her husband and knew of her husband's violent history through prior dealings with him, and because the plaintiff had pleaded for help and had a reasonable expectation of police protection. *Id.* The *Sorichetti* court held that where the police are made aware of a protective order and a possible violation of that order, "they are obligated to respond and investigate, and their acts or omissions in so doing will be subject to a 'reasonableness' review in a negligence action." 65 N.Y.2d at 470, 492 N.Y.S.2d at 597, 482 N.E.2d at 76.

■ The *Sorichetti* "special relationship" rule was reaffirmed and its elements restated by the Court of Appeals in *Cuffy v. City of New York,* 69 N.Y.2d 255, 262, 513 N.Y.S.2d 372, 375, 505 N.E.2d 937, 940 (1987), as: (1) an assumption by the municipality, through promises or actions, of an affirmative duty to act on behalf of the injured party; (2) knowledge on the part of the municipality's agents that inaction could lead to harm; (3) some form of direct contact between the municipality's agents and the injured party; and (4) the injured party justifiably relied on the promise to protect.

The *Cuffy* court noted that, although not dispositive, "the presence of a judicial order of protection contributed to our conclusion in *Sorichetti* that an actionable relationship existed." *Id. See also Berliner v. Thompson,* 174 A.D.2d 220, 578 N.Y.S.2d 687, 689 (3rd Dept.1992) ("*Sorichetti* has substantially obviated the proof required of a plaintiff in establishing a special relationship where a protective order has been issued").

New York City and the Housing police both deny that they were presented with Orders of Protection, contrary to Merced's contentions and notwithstanding an NYPD report of October 22, 1988 which documented that Merced held a valid Order of Protection, as well as two Housing police reports referring Merced to the court for Orders of Protection. The city defendants argue that, as a matter of law, because she has not shown that either of them made her an express promise and that she reasonably relied on such a promise, Merced has failed to establish the existence of a "special relationship."

Applying the rule of *Sorichetti, Cuffy* and *Berliner,* however, questions of material fact that go to the heart of the issue of whether a "special relationship" existed are very much in dispute. Most important, were the NYPD and Housing police aware of Merced's Orders of Protection? If so, was their response to Merced's repeated calls for help reasonable? If they were not aware of the Orders of Protection, did Merced nevertheless have a reasonable expectation of protection? The existence of these critical questions of fact precludes granting summary judgment for the NYPD and Housing Authority police.

However, the city defendants argue in the alternative that, even if Merced establishes the existence of a special relationship, she cannot prove causation because nothing in the record links the unidentified assailants to Navedo. This overlooks the undisputed fact that Navedo had committed violent acts against Merced and had threatened her life on more than one occasion prior to the shooting. This history, which may well be supplemented by further evidence by the time of trial, is sufficient in itself to permit a reasonable juror to draw the inference that Navedo ordered the shooting on the very day that Merced was scheduled to give testimony against him.

## IV.

The United States' Motion

New York City filed a third-party complaint against the United States claiming that, if it were held liable, "the United States should share in that liability" under the Federal Tort Claims Act ("FTCA") because certain NYPD detectives were "deputized and actively engaged at the same time as agents of the United States Drug Enforcement Agency." The gravamen of the third-party complaint is that any damages, if proved by Merced to be the result of New York City's negligence, "are attributable, in whole or in part, to the culpable conduct of the United States of America." (Third–Party Complaint, ¶ 9.)

The United States moves to dismiss for lack of subject matter jurisdiction because the FTCA expressly exempts the Government from liability for "the failure to exercise or perform a discretionary function or duty ... whether or not the discretion involved be abused." 28 U.S.C. § 2680(a) (1993).

The Supreme Court has defined "discretionary function" as conduct involving an "element of judgment or choice" that the exception "was designed to shield." *Berkovitz v. United States,* 486 U.S. 531, 536, 108 S.Ct. 1954, 1958, 100 L.Ed.2d 531 (1988). In a case involving very similar facts—the failure of DEA agents to protect a cooperating witness who was later murdered—the Fourth Circuit affirmed the district court's dismissal of a lawsuit against the United States on the basis of the FTCA's "discretionary function" exemption. *Piechowicz v. United States,* 885 F.2d 1207 (4th Cir.1989). The Fourth Circuit held that "the policy choice whether to offer protection to [plaintiff] ... is just the sort of choice the discretionary function exception insulates from judicial scrutiny." *Id.* at 1211. The United States cannot be sued, therefore, for the decision of its agents not to provide Merced protection.

The issue does not end here, however. New York City argues that if a promise to protect was made to Merced, "the United States may be held liable if it negligently performed pursuant to its commitment."

The Government admits that it "may have a legal duty to protect" if it "voluntarily assumed or incurred that duty to a specific individual," *Piechowicz v. United States,* 685 F.Supp. 486, 498 (D.Md.1988), *aff'd,* 885 F.2d 1207 (4th Cir.1989), but contends that there is no evidence that the DEA undertook to protect Merced. Indeed, the Government stresses that the sole statement in the record which Merced attributes to the DEA—"they told me: Don't worry, that he was going to be taken care of" (Merced Deposition of May 15, 1992 at 173)—"cannot be credibly construed as a promise" (Gov't Reply Mem. at 7).

New York City has failed to establish that any federal agent affirmatively offered Merced protection or thereafter failed to follow through. Merced testified that she did not remember asking the DEA for protection except to tell them of her fear of Navedo. (Merced Deposition of May 15, 1992 at 173.) At most, the record suggests that perhaps the Government "should have offered to protect" Merced, but this is certainly insufficient to establish an affirmative undertaking of a duty. *Piechowicz,* 685 F.Supp. at 498–499. Accordingly, the discretionary function exception applies to bar New York City from claiming contribution from the United States under the Federal Tort Claims Act.

\* \* \* \* \* \*

The motions for summary judgment by New York City and the Housing Authority are granted with respect to Merced's cause of action based on 42 U.S.C. § 1983, and are denied with respect to Merced's cause of action based on New York law. The United States' motion for summary judgment on the Third–Party Complaint is granted.

It is so ordered.