**Diana MERCED, Plaintiff,**

v.

**The CITY OF NEW YORK and The New York City Housing Authority, Defendants.**

**No. 90 CIV. 2898(DC).**

United States District Court, S.D. New York.

Nov. 12, 1997.

Dienst & Serrins, LLP, for Plaintiff by Jonny Kool, New York City.

Windels, Marx, Davies & Ives by Victoria J.B. Doyle, New York City, for Defendant New York City Housing Authority.

Paul A. Crotty, Corporation Counsel of the City of New York Attorney by Gayle S. Sanders, New York City, for Defendant City of New York.

## OPINION

CHIN, District Judge.

On March 9, 1989, two unknown assailants shot plaintiff Diana Merced in the face outside her mother's third-floor apartment in a New York City Housing Authority project in the Bronx. Plaintiff alleges that Joseph Navedo, her ex-boyfriend and the father of her child, was behind the shooting. Navedo was a known drug dealer, and plaintiff had been cooperating with the authorities in their efforts to prosecute him. The shooting occurred on the very day that plaintiff had been scheduled to testify against Navedo. Although the trial was adjourned at the last moment, plaintiff was shot as she left her apartment to take out the trash.

Plaintiff sued the New York City Housing Authority (the "Housing Authority") and the City of New York (the "City") for damages for her injuries sustained as a result of the March 9, 1989 shooting. She claims that the Housing Authority Police Department (the "HAPD") and the New York City Police Department (the "NYPD") negligently failed to protect her from Navedo.

Defendants move for summary judgment, arguing that plaintiff cannot establish a genuine issue of material fact as to whether the HAPD and the NYPD owed her a special duty of police protection under New York

law. Additionally, the Housing Authority contends that, even assuming the HAPD did owe her a special duty, plaintiff cannot establish that any negligent act or omission on the part of the HAPD was the proximate cause of her injuries, given that the March 9, 1989 shooting was perpetrated by unknown assailants.

Genuine issues of fact are presented, however, as to both the existence of a special relationship and the issue of proximate cause. Plaintiff was cooperating with law enforcement authorities, who knew that Navedo had physically abused and threatened her. Indeed, they were aware that at one point Navedo had kidnapped plaintiff and her son and threatened to kill them. The authorities were aware of the orders of protection that plaintiff had obtained against Navedo. Finally, plaintiff had specifically asked both the HAPD and the NYPD for assistance, and they had repeatedly assured her that "everything would be taken care of." Yet, on the day that plaintiff had been scheduled to testify against Navedo, she was shot. A reasonable jury could find, on these facts, that defendants owed a special duty to plaintiff, that they failed to meet their obligations to plaintiff, and that, as a proximate result, she was shot. Accordingly, both motions for summary judgment are denied.

## BACKGROUND

### A. The Facts

Plaintiff met Joseph Navedo in September of 1983 and began dating him about a year later. Their relationship was quite turbulent from the beginning. Early on, plaintiff attempted to leave Navedo several times, but each time she tried, he threatened to harm her and her family if she left him.

### 1. The Ramada Inn Arrest

Navedo was a drug dealer, and plaintiff routinely accompanied him on trips between New York City and Florida, the purpose of which was to transport drugs. Sometime in the spring of 1987, when plaintiff and Navedo had just returned from Florida and were staying at the Ramada Inn in Manhattan, Navedo demanded that plaintiff accompany him on a trip to Puerto Rico, also to transport drugs. Plaintiff, however, refused. Navedo became angry and threatened to kill her if she did not accompany him.

Frightened, plaintiff called her mother from the hotel. Plaintiff's mother, Ramonita Merced, said she would contact the police on plaintiff's behalf, and she went to the 44th Precinct, where she spoke to Detective Jose Arroyo. She explained her daughter's situation to Detective Arroyo, and also informed him that Navedo was a drug trafficker who had just come back from Miami with drugs. Detective Arroyo assured plaintiff's mother that the police would get plaintiff out of the hotel safely and that they would apprehend Navedo. Later that evening, plaintiff spoke to Detective Arroyo herself and expressed her fear of Navedo for having informed on him. While plaintiff did not specifically ask for police protection at this time, Detective Arroyo reassured her that "everything was going to be taken care of, that they were going to pick him up," (Kool Aff., Exh. K, Deposition of Diana Merced dated May 15, 1992 at 158 [hereinafter Diana Merced Dep. Tr., Vol. II] ), and that "it was over. [Navedo] was going to spend a lot of time in jail. [Plaintiff] didn't have to worry." (Doyle Aff., Exh. C, Deposition of Diana Merced dated May 29, 1992 at 29 [hereinafter Diana Merced Dep. Tr., Vol. III] ).

Thereafter, Detective Arroyo contacted the United States Drug Enforcement Administration (the "DEA"). He spoke to NYPD Detective Bruce Rivera, who was assigned to the Drug Enforcement Task Force (the "DETF"), a joint task force comprised of DEA agents and city and state police officers, and relayed the information told to him by plaintiff and plaintiff's mother. Detective Rivera went to plaintiff's mother's house to discuss with her Navedo's whereabouts. Plaintiff's mother described her daughter's situation and expressed her fear for her daughter's safety. Detective Rivera explained to plaintiff's mother the available options for ensuring plaintiff's safety, which included relocating her or placing her in the witness protection program. Detective Rivera also spoke with plaintiff that evening. Plaintiff reluctantly told him the details of

Navedo's plans, to assist the DETF in Navedo's arrest. She also expressed her fear that Navedo would find out about her cooperation with the authorities. Detective Rivera assured her that Navedo would not find out and "explained to her ... the options she ha[d] as far as protection." (Kool Aff., Exh. K, Deposition of Bruce Rivera dated September 22, 1992 at 18 [hereinafter Rivera Tr.]).

The next day, members of the DETF arrived at the Ramada Inn and arrested Navedo pursuant to an outstanding federal warrant. Based on additional information provided by plaintiff, authorities recovered drug evidence hidden in a trap door located in Navedo's vehicle.

After his arrest, Navedo was incarcerated, and plaintiff thought she was safe because she believed that Navedo was going to remain in jail for a long time. At some point during his incarceration, however, Navedo offered to cooperate with the DEA and the U.S. Attorney's Office by acting as a registered confidential informant on the street. Consequently, Navedo remained in prison for only three months, and was released in July of 1987. Upon learning of Navedo's release, plaintiff contacted Detective Rivera and expressed her renewed fear that Navedo would discover that plaintiff had cooperated with the police. Again, Rivera "assured her there was no way [Navedo] would know and, to the best of [his] knowledge, he didn't know," and that "unless she said anything, he doesn't know and there is no reason for him to know." (Doyle Aff., Exh. J, Rivera Tr. at 25–26, 31). Detective Rivera also told her, "whenever he is doing anything else funny, call us, and we will get him." (Kool Aff., Exh. K, Diana Merced Dep. Tr., Vol. II at 172). Based on this conversation, plaintiff believed that the NYPD was going to take some action to protect her from Navedo; no action was taken at all, however, and Navedo remained on the streets.

### 2. *Further Assaults and Incidents of Harassment by Navedo*

From the time of his release in July of 1987, Navedo continually came to plaintiff's mother's apartment in the housing project at 3204 Park Avenue in the Bronx, where plaintiff was residing. According to plaintiff, on several occasions, Navedo would bang on the door, curse, threaten, and harass plaintiff and her family. She would call the HAPD, but by the time an officer arrived, Navedo would have already left. The officer who arrived at the scene would tell plaintiff to call again if Navedo came back, and reassured her that they would respond.

After two such incidents, on August 28, 1988 and September 19, 1988, plaintiff filed formal, written complaints against Navedo with the HAPD. These reports indicate that after each incident, plaintiff was referred to court for an order of protection. (*See* Kool Aff., Exh. C). Plaintiff had previously obtained an order of protection against Navedo from the Bronx Criminal Court on February 22, 1988, and after the above incidents, she secured a second order of protection from the Bronx Family Court on September 22, 1988. Despite these orders of protection, Navedo continued to harass and threaten plaintiff.

Sometime between September 22, 1988 and October 31, 1988, Navedo assaulted plaintiff again by punching her in the face with a pair of brass knuckles. The police were summoned, and, according to plaintiff's testimony, both the HAPD and the NYPD responded to the call. The HAPD officer told her that they could not do anything about it because Navedo had already fled the scene; however, he also told her that "the next time [Navedo] came around to call them, they would come by." (Kool Aff., Exh. K, Diana Merced Dep. Tr., Vol. II at 194). Following treatment at Lincoln Hospital, plaintiff went to the local NYPD precinct to make a report. At that time, plaintiff contends she presented her September 22, 1988 order of protection and told an officer at the precinct that she was scared that Navedo would try to harm her again. Again, plaintiff was told that there was nothing the police could do, and that eventually Navedo would leave her alone.

### 3. *Kidnapping and Assault Incident of October 6, 1988*

On October 6, 1988, Navedo forced plaintiff into his vehicle at gunpoint, demanding that

she and their child accompany him on a trip to Florida. When plaintiff refused, Navedo handcuffed her and assaulted her in his car. He also pointed to a chain saw in the back seat of the vehicle and threatened to cut her up in pieces with it if she refused to go with him to Florida. Eventually, Navedo let plaintiff go, but then followed her to her mother's apartment. Navedo then snatched the couple's child and threatened to kill him if plaintiff or her family tried to interfere.

Plaintiff immediately reported the kidnapping and assault to Detective Wagner at the HAPD. Detective Wagner, along with Detective Cebollero and Lieutenant Durando of the DETF, negotiated with Navedo for the return of the child. During the negotiations with Navedo, he demanded to speak to plaintiff on the phone. The officers listening in heard Navedo make death threats to plaintiff, yet they told plaintiff that he was merely trying to scare her. The collective effort of the HAPD and the DETF resulted in the return of the child, although, in exchange for release of the child, the officers promised Navedo that they would not arrest him. Navedo was eventually arrested and charged for these crimes, but not until November 17, 1988.

#### 4. *Shooting Incident of October 22, 1988*

More violence ensued prior to Navedo's November 17, 1988 arrest. On October 22, 1988, while plaintiff attended a birthday party at her cousin's apartment in the Bronx, an unknown assailant fired ten gunshots into the living room, one of which struck another of plaintiff's cousins also attending the party. The incident was reported to the NYPD 52nd Precinct, and Detective Ross Perrone was assigned to the investigation. The police report reflects that plaintiff related her suspicion that Navedo was behind the shooting, a suspicion that was later confirmed. The report also states that plaintiff informed Detective Perrone of the September 22, 1988 order of protection issued by the Bronx Family Court. Plaintiff testified that at this time, she asked Detective Perrone for protection, but he responded that he could do nothing because the police could not prove that Navedo perpetrated the shooting. The 52nd Pre-

cinct investigated the shooting for about two months, but was unable to identify the assailant, and therefore had to close the case without arrest for lack of evidence.

#### 5. *Navedo's Second Arrest*

Navedo was finally arrested and charged with various crimes in connection with the October 6, 1988 assault and kidnapping incident on November 17, 1988. Plaintiff was required to act as a witness in Navedo's kidnapping and assault prosecution. Detective Estrada of the HAPD testified at his deposition that it is HAPD policy for a witness in an ongoing criminal prosecution to be accorded extra protection. Plaintiff testified that she asked the HAPD for protection. She was accorded no such protection, however, and at each court appearance she attended, Navedo leveled more death threats at her. These threats continued into January and February of 1989.

Although plaintiff had obtained two more orders of protection from the Bronx Criminal Court, on December 22, 1988 and January 11, 1989, neither the HAPD nor the NYPD took any steps to protect plaintiff from Navedo. Detective Wagner of the HAPD told plaintiff that Navedo was just trying to scare her, that Wagner was "around" (Kool Aff., Exh. K, Statutory Hearing of Diana Merced dated August 21, 1989 at 161 [hereinafter Diana Merced Hearing Tr., Vol. II]), and that plaintiff should stay in her house and try to avoid seeing Navedo. Plaintiff followed Detective Wagner's advice for the most part, and requested that an HAPD officer accompany her when she needed to leave her apartment; however, this request was denied. Plaintiff also requested that the Housing Authority relocate her and her family. While the subject was discussed, plaintiff contends that "they just talked about it. They didn't really make an effort to move us." (Kool Aff., Exh. K, Diana Merced Dep. Tr., Vol. II at 214).

#### 6. *The March 9, 1989 Shooting*

Plaintiff was scheduled to appear in Bronx Criminal Court on March 9, 1989 to testify against Navedo. Early that morning, she was informed by the Assistant District Attor-

ney prosecuting the case that the trial had been adjourned at the last minute. Hence, instead of going to court, she remained at home. Plaintiff momentarily stepped outside of her apartment to take out the trash when she observed two individuals, with hoods pulled down over their heads to obscure their faces, suddenly appear in the stairwell. One of the individuals said to the other, "That is her. Do it now," and then they fired six shots. (Doyle Aff., Exh. A, Deposition of Diana Merced dated May 12, 1992 at 55). Two shots struck plaintiff: one penetrated her right shoulder and the other lodged in her cheekbone. The two assailants fled immediately. The perpetrators of the shooting were never found, but plaintiff is convinced that they were sent by Navedo to kill her, to prevent her from testifying against him.

### B. *Procedural History*

This action was initially filed in New York State Supreme Court, Bronx County, but the Housing Authority removed it to this Court where it was assigned to Judge Wood. Plaintiff moved to remand the case to state court. This motion, however, was denied. *See Merced v. City of New* York, No. 90 Civ. 2898, 1991 WL 222152 (S.D.N.Y. Oct.22, 1991). Plaintiff's amended complaint alleged claims against the Housing Authority and the City under 42 U.S.C. § 1983 and New York State common law. The City, in turn, impleaded the DEA as a third party defendant, seeking indemnity and contribution under the Federal Tort Claims Act in the event that the City was found liable to the plaintiff, on the ground that some of the NYPD officers in question were acting in their capacity as members of the DETF, which was supervised by the DEA.

All three defendants moved for summary judgment in Judge Wood's court. Before Judge Wood rendered a decision on the motion, the case was reassigned to Judge Lasker on February 2, 1994. In a written decision dated July 7, 1994, Judge Lasker granted summary judgment in favor of the DEA, dismissing it from the action, and in favor of the Housing Authority and the City on the federal claims. He denied the motion with respect to the state law negligence claims. *See Merced v. City of New York,* 856 F.Supp. 826 (S.D.N.Y.1994).

On August 14, 1995, the case was reassigned to me. Discovery continued, and plaintiff moved again to remand the case to state court. That motion, too, was denied. *See Merced v. City of New York,* No. 90 Civ. 2898, 1996 WL 219645 (S.D.N.Y. May 1, 1996). At a conference on February 25, 1997, because plaintiff was having some difficulty in preparing a pretrial order identifying evidence that she intended to introduce at trial to establish the existence of a "special relationship" between her and the two remaining defendants, and with discovery then complete, I granted defendants leave to refile motions for summary judgment on the state law negligence claims. Having now reviewed in detail the materials submitted in connection with defendants' motions, I hold that plaintiff raises genuine issues of material fact as to whether a "special relationship" existed between her and the HAPD and the NYPD and as to whether, given this "special relationship," their failure to adequately protect plaintiff from her ex-boyfriend was the proximate cause of her injuries, entitling her to proceed to trial on her negligence claims against both defendants. Accordingly, both motions for summary judgment are denied.

### DISCUSSION

### A. *Standards for Summary Judgment*

The standards applicable to motions for summary judgment are well-settled. A court may grant summary judgment only where there is no genuine issue of material fact and the moving party is therefore entitled to judgment as a matter of law. See Fed. R.Civ.P. 56(c). Accordingly, the court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Summary judgment is inappropriate if, resolving all ambiguities and drawing all inferences against the moving party, *id.* at 255, 106 S.Ct. at 2513–14 (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970)), there exists a dispute about a material fact

"such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.

Once the moving party meets its initial burden of production, the burden shifts to the nonmoving party to demonstrate that there exist genuine issues of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). To defeat a motion for summary judgment, however, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586, 106 S.Ct. at 1356. There is no issue for trial unless there exists sufficient evidence in the record favoring the party opposing summary judgment to support a jury verdict in that party's favor. *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510–11. As the Supreme Court stated in *Anderson*, "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50, 106 S.Ct. at 2511 (citations omitted). With these standards in mind, the Court turns to the defendants' respective motions for summary judgment.

The only claims that remain in this case are plaintiff's negligence claims against the Housing Authority and the City for failure to provide police protection under New York State law. To prevail, plaintiff must prove that (1) a special relationship existed between her and defendants' agents, creating an actionable legal duty on the part of the HAPD and the NYPD to provide her with police protection, and (2) defendants' agents were negligent in failing to provide her with police protection.

**B. *Existence of a "Special Relationship"***

■ As a general rule, a municipality may not be held liable for injuries resulting from a failure to provide police protection because "a municipality's duty to provide police protection is ordinarily one owed to the public at large and not to any particular individual or class of individuals." *Cuffy v. City of New York*, 69 N.Y.2d 255, 513 N.Y.S.2d 372, 374, 505 N.E.2d 937, 940 (Ct. App.1987). In a narrow class of cases, however, a court will hold a municipality liable in

tort for injuries resulting from a failure to provide adequate police protection if the plaintiff can show the existence of a "special relationship" between her and the municipality. *Sorichetti v. City of New York*, 65 N.Y.2d 461, 492 N.Y.S.2d 591, 595, 482 N.E.2d 70, 74 (Ct.App.1985).

■ To prove the existence of a "special relationship," a plaintiff must establish the following four elements: "(1) an assumption by the municipality, through promises or actions, of an affirmative duty to act on behalf of the party who was injured; (2) knowledge on the part of the municipality's agents that inaction could lead to harm; (3) some form of direct contact between the municipality's agents and the injured party; and (4) that party's justifiable reliance on the municipality's affirmative undertaking." *Cuffy*, 513 N.Y.S.2d at 375, 505 N.E.2d at 940. The guiding principle in those cases in which courts have held a municipality liable is as follows: "If conduct has gone forward to such a stage that inaction would commonly result, not negatively merely in withholding a benefit, but positively or actively in working an injury, there exists a relation out of which arises a duty to go forward." *H.R. Moch Co. v. Rensselaer Water Co.*, 247 N.Y. 160, 167, 159 N.E. 896 (1928) (Cardozo, J.).

**1. *The Housing Authority***

■ The Housing Authority argues that summary judgment in its favor is appropriate because plaintiff cannot establish that a "special relationship" between her and the HAPD existed, obligating it to protect her from Navedo. I disagree. For purposes of this motion, the Court must accept as true plaintiff's pretrial testimony concerning the sequence of events leading up to the March 9, 1989 shooting. Viewing the evidence in this case in the light most favorable to plaintiff, I conclude that a reasonable jury could find that there existed a special relationship between her and the HAPD.

**a. *Assumption of Affirmative Duty***

With regard to the first *Cuffy* element, the Housing Authority contends that the record is entirely lacking in evidence suggesting

that the HAPD promised to provide police protection to plaintiff prior to the March 9 shooting. Specifically, the Housing Authority contends that no HAPD officer ever made an explicit promise of protection, and that, even though plaintiff had obtained several orders of protection against Navedo between August 1988 and March 1989, she never presented any of them at an HAPD precinct, reported a violation of any of the orders, or asked the HAPD for enforcement of the orders. Plaintiff, on the other hand, contends that she repeatedly reached out for protection and assistance from the HAPD in reaction to Navedo's continued threats and harassment, that Detective Wagner in particular reassured her that he would be there for her, and that everything would be all right, and that the HAPD was indeed aware of her orders of protection against Navedo.

While the evidence does not establish an explicit promise of police protection on the part of the HAPD, viewed in the light most favorable to plaintiff, plaintiff's proffered evidence could lead a reasonable jury to conclude that the HAPD nevertheless implicitly promised her protection or otherwise assumed an affirmative duty to act on her behalf. First, plaintiff's testimony demonstrates that she repeatedly asked for protection from the HAPD in response to the continued threats, harassment, and assaults leveled against her by Navedo. Plaintiff concedes that no HAPD officer made an explicit offer of police protection; however, when plaintiff called the HAPD in response to Navedo's threats and harassment, the HAPD officers repeatedly assured her that "[i]f he comes back again, call us again, and we will be back." (Kool Aff., Exh. K, Diana Merced Dep. Tr., Vol. II at 179). Additionally, after the incident where Navedo punched plaintiff in the eye with brass knuckles, the HAPD officers who arrived at the scene told plaintiff that "the next time he came around to call them, they would come by." (Kool Aff., Exh. K, Diana Merced Dep. Tr., Vol. II at 194). Similarly, when plaintiff reported the death threats and harassment by Navedo that occurred in January and February of 1989, Detective Wagner assured her that he was "around."

(Kool Aff., Exh. K, Diana Merced Hearing Tr., Vol. II at 161).

Moreover, Detective Estrada of the HAPD testified that it was standard HAPD procedure to afford a housing project tenant acting as a witness in a criminal case extra protection when that witness was being harassed or threatened:

> If a person is a witness in a matter in court where the defendant has been arrested and the matter is going to trial or hearing ..., if this person now is threatened or harassed by the individual or somebody else ... [t]hat is what we call tampering with a witness. Added police protection will be implemented in that case....

(Kool Aff., Exh. K, Deposition of Jose Estrada dated May 27, 1992 at 17–18). Finally, when plaintiff reported the incidents of threats and harassment by Navedo in the months preceding the March 9, 1989 shooting, her complaints were documented in reports, which indicate that plaintiff was referred to court to seek orders of protection. Plaintiff, in fact, obtained numerous orders of protection against Navedo prior to the shooting, at least two of which were the result of referrals by the HAPD. The HAPD cannot seriously contend that it was unaware of these orders of protection or that it was unaware that Navedo's repeated assaults, threats, and harassment directed toward plaintiff, which she dutifully reported to the HAPD, constituted a violation of those orders of protection. "[W]hen the police are made aware of a possible violation [of an order of protection], they are obligated to respond and investigate, and their actions will be subject to a 'reasonableness' review in a negligence action," *Sorichetti*, 492 N.Y.S.2d at 597, 482 N.E.2d at 76, and "reasonableness" is generally a matter for the jury to decide.

Plaintiff offers testimony that Detective Wagner reassured her that the HAPD would be there for her. Detective Estrada testified that it is standard procedure to give intimidated witnesses extra protection. Plaintiff attests that HAPD officers were aware that orders of protection against Navedo were in place and that Navedo was in violation of these orders of protection. Accepting plain-

tiff's testimony as true and drawing all inferences in plaintiff's favor, a rational jury could conclude from the above evidence that the HAPD, through the words and conduct of its individual officers, assumed an affirmative duty to act on plaintiff's behalf. *Cf. Zwart v. Town of Wallkill,* 192 A.D.2d 831, 596 N.Y.S.2d 557, 559–60 (3d Dep't 1993) (holding that officers' awareness of abuse of plaintiff by her husband, based on personal knowledge and complaints lodged by plaintiff, and plaintiff's testimony that officers knew of her order of protection against husband and husband's violation thereof, raised genuine issues of material fact as to whether officers assumed a duty to protect plaintiff from her abusive husband); *Berliner v. Thompson,* 166 A.D.2d 78, 569 N.Y.S.2d 777, 779 (3d Dep't 1991) (holding that where police department took some steps to aid plaintiff's decedent, but where there was no evidence that the police department assured her of immediate action against her estranged husband, "contrary inferences [could] reasonably be drawn concerning the assumption of duty to act which present[ed] triable issues of fact not determinable on a motion for summary judgment"); *Baker v. City of New York,* 25 A.D.2d 770, 269 N.Y.S.2d 515, 518 (2d Dep't 1966) ("Plaintiff, we think, was a person recognized by the order of protection as one to whom a special duty was owed.... Plaintiff was ... singled out by judicial process as a person in need of special protection and peace officers had a duty to supply protection to her.").

### b. *Knowledge that Inaction Could Lead to Harm*

The Housing Authority did not address the second *Cuffy* element in its moving papers. There is, however, sufficient evidence in the record from which a rational jury could conclude that the Housing Authority was aware that Navedo was a violent person and therefore that its inaction could lead to plaintiff's harm.

The Housing Authority had knowledge of Navedo's violent propensity based on his repeated death threats aimed at plaintiff, his harassment of her, and, most importantly, the multiple orders of protection plaintiff ob-

tained against Navedo. An order of protection:

> evinces a preincident legislative and judicial determination that its holder should be accorded a reasonable degree of protection from a particular individual. It is presumptive evidence that the individual whose conduct is proscribed has already been found by a court to be a dangerous or violent person and that violations of the order's terms should be treated seriously.

*Sorichetti,* 492 N.Y.S.2d at 596–97, 482 N.E.2d at 75–76. While HAPD Detective Wagner claims to have no memory as to whether plaintiff presented her orders of protection to him, plaintiff testified that she indeed presented them to the HAPD after the October 1988 incident when Navedo punched her in the face with brass knuckles. Moreover, the HAPD was directly involved with both this particular assault of plaintiff allegedly perpetrated by Navedo as well as the kidnapping of plaintiff's son by Navedo. In addition, plaintiff filed at least two complaints with the HAPD based on Navedo's repeated harassment and death threats. Taken together, these facts raise a genuine issue of fact concerning whether the Housing Authority knew or should have known that its inaction could lead to plaintiff's harm or death.

### c. *Direct Contact Between the Municipality's Agents and the Injured Party*

The New York Court of Appeals has stated that "[t]he requirement of direct contact ... serves to rationally limit the class of persons to whom the municipality's duty of protection runs." *Kircher v. City of Jamestown,* 74 N.Y.2d 251, 544 N.Y.S.2d 995, 998, 543 N.E.2d 443, 446 (Ct.App.1989). Again, the Housing Authority does not challenge plaintiff's evidence on this element, and, in fact, there is ample evidence in the record to establish that there was direct contact between her and the Housing Authority's agents. Plaintiff filed at least two complaints against Navedo with the HAPD in person; plaintiff testified that she informed agents of the HAPD of her orders of protection obtained against Navedo; and plaintiff cooperated with members of the HAPD as part of

the ongoing investigation and prosecution of Navedo for drug activity and incidents of violence against plaintiff. Hence, plaintiff has satisfied her burden as to the third *Cuffy* element as well.

### d. *Justifiable Reliance on the Municipality's Affirmative Undertaking*

■ "The reliance element is 'critical in establishing the existence of a "special relationship" ' because it provides the essential causative link between the "special duty" assumed by the municipality and the alleged injury." *Raucci v. Town of Rotterdam,* 902 F.2d 1050, 1058 (2d Cir.1990) (quoting *Cuffy,* 513 N.Y.S.2d at 375, 505 N.E.2d at 940). "The thread that runs through the cases analyzing this critical element 'is the unfairness that the courts have perceived in precluding recovery when a municipality's voluntary undertaking has lulled the injured party into a false sense of security and has thereby induced [her] either to relax [her] own vigilance or to forego other available avenues of protection.' " *Berliner v. Thompson,* 569 N.Y.S.2d at 779 (quoting *Cuffy,* 513 N.Y.S.2d at 375, 505 N.E.2d at 940).

The Housing Authority argues that plaintiff has presented no evidence that she relied to her detriment upon any assurances of protection made by the HAPD. The evidence, however, indicates that plaintiff in fact relied on Detective Wagner's assurances. As late as February 1989, Detective Wagner assured plaintiff that she should not worry and that he would be "around" if Navedo bothered her again. Moreover, plaintiff followed Detective Wagner's advice that she stay in her apartment and avoid all contact with Navedo, which is exactly what she was trying to do on March 9, 1989, the day she was shot. There was nothing more that plaintiff could have done to avoid Navedo. On the other hand, the HAPD, well aware of Navedo's violent propensities, could have done more to protect plaintiff, such as post an officer outside her door on the very day that she was supposed to testify, or at least relocate her to another Housing Authority building, as Detective Wagner had discussed with plaintiff and as plaintiff had, in fact, requested. One can infer from this evidence that plaintiff was

"lulled ... into a false sense of security" by Detective Wagner's assurances, *Cuffy,* 513 N.Y.S.2d at 375, 505 N.E.2d at 940, and therefore that if the HAPD had given her the protection that the HAPD normally gives to intimidated witnesses, the March 9, 1989 shooting of plaintiff might not have occurred. Thus, plaintiff also raises a genuine issue of material fact as to the fourth *Cuffy* element. Accordingly, I hold that, based on the evidence in the record, a reasonable jury could conclude that a "special relationship" existed between plaintiff and the Housing Authority.

### 2. *The City*

■ The City also contends that it is entitled to summary judgment because plaintiff fails to raise a genuine issue of material fact as to the first and fourth *Cuffy* elements. Specifically, the City argues that plaintiff is unable to establish that Detective Arroyo of the NYPD affirmatively promised to provide her with protection against Navedo, and, in any event, plaintiff could not have justifiably relied on any alleged promise by Detective Arroyo to provide her with police protection because her contacts with Detective Arroyo of the NYPD occurred two years before the March 9, 1989 shooting. Plaintiff argues, however, that her and her mother's conversations with Detective Arroyo were not the only contacts plaintiff had with the NYPD throughout her ordeal. Plaintiff testified that she had presented her September 22, 1988 order of protection against Navedo to the NYPD when she reported her assault by Navedo with brass knuckles sometime in October of 1988 and then again when she was interviewed by Detective Perrone after the October 22, 1988 shooting incident. Plaintiff contends that presentation of an order of protection satisfies proof of assumption of duty, knowledge that inaction could lead to harm, and justifiable reliance. Moreover, plaintiff argues that she had direct contact with the NYPD in assisting them in the arrest and prosecution of Navedo for his various crimes between the spring of 1987 and March 9, 1989.

■ I find that plaintiff's evidence concerning her dealings with the NYPD could lead a reasonable jury to conclude that a

special relationship existed between her and the NYPD. *"Sorichetti* has substantially obviated the proof required of a plaintiff in establishing a special relationship where a protective order has been issued." *Berliner v. Thompson,* 174 A.D.2d 220, 578 N.Y.S.2d 687, 689 (3d Dep't 1992). Evidence that the police have been made aware of an order of protection, and of a possible violation of that order, "satisfies proof of an affirmative duty to act, knowledge that inaction could lead to harm and justifiable reliance on the defendant['s] affirmative undertaking." *Id.* Accepting as true the plaintiff's testimony that she presented her order of protection to NYPD officers after the brass knuckles assault and again after the October 22, 1988 shooting incident, as well as her testimony that she dealt personally with NYPD Detectives Arroyo, Perrone, and Rivera on numerous occasions over a two-year period, I conclude that plaintiff satisfies her burden on all four *Cuffy* elements.

Alternatively, a rational jury could infer that a special relationship existed between plaintiff and the NYPD based on the evidence that plaintiff turned Navedo in to the police in the first place and assisted the NYPD in his prosecution by serving as a witness against him. "A special relationship between an individual and a municipality has . . . been found to exist where the individual collaborates with the police in the arrest or prosecution of a criminal and is threatened with bodily harm as a result." *Greene v. City of New York,* 152 Misc.2d 786, 583 N.Y.S.2d 766, 767–68 (Sup.Ct. Queens County 1992) (citing *Schuster v. City of New York,* 5 N.Y.2d 75, 180 N.Y.S.2d 265, 154 N.E.2d 534 (1958)).

> *Schuster, supra,* has not been overruled, abandoned, restricted or modified or subsumed by the long line of cases requiring the existence of a 'special relationship' . . . . Rather, a special relationship or special duty already exists where an individual collaborates with the police in the arrest and prosecution of a criminal and is there-

fore threatened with bodily harm. Under these circumstances, an individual need not plead or establish the elements of a special relationship as set forth in *Cuffy.*

*Id.* 583 N.Y.S.2d at 768.

Here, plaintiff collaborated with the NYPD in connection with the arrest of Navedo at the Ramada Inn, the investigation of Navedo for the assault of plaintiff and kidnapping of their son on October 6, 1988, and the investigation of Navedo for the October 22, 1988 shooting at plaintiff's cousin's apartment. Additionally, plaintiff was to be the key witness against Navedo in his kidnapping and assault prosecution. Furthermore, plaintiff repeatedly informed the NYPD of the threats leveled against her by Navedo as a result of her cooperation. Given such assistance, a rational jury could also conclude that a special relationship existed between plaintiff and the NYPD, precluding summary judgment in favor of this defendant.

### C. *Proximate Cause*

As an additional ground for summary judgment in its favor, the Housing Authority contends that, even assuming that plaintiff can establish that a special relationship existed between her and the HAPD, she is unable to prove that the HAPD's failure to protect her from Navedo was the proximate cause of the March 9, 1989 shooting and therefore cannot make out a *prima facie* case of negligence against the Housing Authority.[1] Plaintiff responds that in "special relationship" cases, the causation requirement overlaps with the four-part *Cuffy* test for establishing a "special relationship." Because a plaintiff must establish a causal connection between the plaintiff's justifiable reliance on the assurances of police protection and the harm suffered, she need not prove proximate cause separate and apart from establishing the four *Cuffy* elements.

Even assuming there is a separate requirement to prove proximate cause in "special relationship" cases, given the events in the two-year period preceding the March 9, 1989 shooting, a reasonable jury could

---

**1.** The City does not press this argument in support of its motion for summary judgment. It relies exclusively on plaintiff's inability to establish the existence of a "special relationship."

infer that Navedo was behind the shooting of plaintiff that occurred on the very day she was scheduled to testify against him in Bronx Criminal Court. "[T]he question of proximate cause is a matter for the jury," *Baker v. City of New York,* 269 N.Y.S.2d at 519; accordingly, plaintiff is entitled to present her evidence of causation to the jury.

### CONCLUSION

For the foregoing reasons, defendants' respective motions for summary judgment are denied. The parties shall have 30 days to complete and submit to the Court their joint pretrial order. A final pretrial conference to discuss settlement and a trial date will be held on December 19, 1997 at 11:00 a.m.

SO ORDERED.