**Delgo TAYLOR, Appellant,**

v.

**DISTRICT OF COLUMBIA, Appellee.**

No. 98–CV–56.

District of Columbia Court of Appeals.

Argued April 20, 2000.
Decided July 26, 2001.

Morgan J. Hallmon, Bethesda, MD, for appellant.

Mary T. Connelly, Assistant Corporation Counsel, with whom Robert Rigsby, Interim Corporation Counsel at the time the brief was filed, and Charles Reischel, Dep-

uty Corporation Counsel, were on the brief, for appellee.

Before TERRY, REID and WASHINGTON, Associate Judges.

REID, Associate Judge:

In this case, appellant Delgo Taylor filed a wrongful death and survival action against the District of Columbia, alleging that "[t]he District [ ] owed a special duty to [her son, Lawrence Taylor], an informant for the Metropolitan Police Department ("MPD") and an individual who assisted the police in arresting and prosecuting a known dangerous criminal ....."; and that the District's negligence in failing to properly protect Mr. Taylor was the proximate cause of his murder, his pain and suffering, and her loss as well as that of his minor child. The trial court granted summary judgment in behalf of the District. Ms. Taylor filed a timely appeal. We affirm, concluding that Ms. Taylor failed to present evidence showing that her son satisfied the "justifiable reliance" prong of the special relationship test, or that he was an informant for the MPD; and thus, did not refute the District's evidence establishing, as a matter of law, that the police owed him no special duty of protection.

## FACTUAL SUMMARY

The record before us shows the following assertions by appellant, as the basis of her legal action against the District. After Martinez Crowder, a close friend of Mr. Taylor's brother, was murdered in December 1992, Mr. Taylor became an informant for three MPD detectives, Gary Mock, Joseph Fox and LaJuan Lynch. Mr. Taylor provided one detective with information that was critical to the arrest of Antoine Fice Ackwith, who was believed to have murdered Mr. Crowder. In addition, Mr. Taylor relayed the addresses of crack houses located in the Montana Terrace Apartments in the Northeast quadrant of the District, and assisted in the arrest of Rafael Parker,[1] a person thought to be the head of a Montana Terrace drug gang. The police were alerted to threats made against Mr. Taylor's life. Around April 14, 1993, Mr. Taylor was shot in the buttocks by Mr. Parker. Both Mr. Parker and Mr. Ackwith were arrested the following day. However, Mr. Ackwith was released from custody on April 27, 1993, apparently because frightened witnesses refused to testify against him. Although the police knew that Mr. Ackwith was free and had lived in the Montana Terrace area, they failed to warn Mr. Taylor. Subsequently, on May 2, 1993, Mr. Taylor was fatally shot when approximately eighteen bullets penetrated his body.

The District denied that Mr. Taylor was an informant for its police detectives. It also denied that it owed any special duty to Mr. Taylor, or that it had entered into a special relationship with him.

After Ms. Taylor's case had progressed through the discovery stage, the District filed a motion for summary judgment, contending in part, that Ms. Taylor had "no evidence to prove that [her son] had a special relationship with the Metropolitan Police Department...." Attached to the motion were several exhibits, including affidavits from detectives. Detective Fox's affidavit acknowledges that he spoke with Mr. Taylor concerning Mr. Crowder's murder, but makes no mention of using Mr. Taylor as an informant. Detective Thomas B. Shaw stated: "To the best of my knowledge, Lawrence Taylor was not a paid or unpaid informant for any member of the Metropolitan Police Depart-

1. The spelling of Mr. Parker's first name also appears in the record as "Raphael."

ment during the investigation of Martinez Crowder." Detective Ray A. Crawford, who was in charge of the investigation of Mr. Taylor's murder asserted: "Based on my working relationship with the detectives of the Fifth District and the homicide detectives, I would have been notified if Lawrence Taylor was acting as a paid or unpaid informant for any District or Homicide detectives in the Metropolitan Police Department." He also declared: "Nothing in my investigation of Lawrence Taylor's homicide led me to believe that [Mr.] Taylor was acting as a paid or unpaid informant for Detective Fox in the investigation of the homicide of Martinez Crowder." Furthermore, he denied that Mr. Taylor was an informant for either Detective Mock or Detective Lynch. Detective Mock categorically denied that Mr. Taylor served as an informant for him: "Never at any time did Lawrence Taylor act as a paid or unpaid informant for me."

Ms. Taylor's opposition to the District's summary judgment motion relied on several affidavits and depositions. An Assistant United States Attorney, Ronald L. Walutes, declared that: "Detective Joseph Fox told me that Mr. Taylor had been assisting him in the investigation of the Crowder murder. I believe this occurred after the murder of Lawrence Taylor." This affidavit was consistent with the government's April 19, 1994 pleading in opposition to a motion to sever defendants charged with the murder of Mr. Taylor, which was attached to the Joint Pretrial Statement in this case as one of plaintiff's exhibits. In that pleading, signed by Mr. Walutes, the government states that "[Mr.] Taylor was target[ed]," in part, because he "was assisting the homicide branch [of the Metropolitan Police Department] in their investigation of [Martinez Crowder's] homicide . . . ." Elkaner Douglas, a resident of the Montana Terrace apartments, who witnessed Mr. Taylor's murder, stated that he "called 911 and was told that the police were already aware of the emergency." The mother of Mr. Crowder said that she and Mr. Taylor met with Detective Fox at least ten times to discuss her son's murder and that, "[o]n occasion, [Mr. Taylor] passed on information about the murder of [her] son."

Perhaps the most extensive details about the alleged contact between Mr. Taylor and Detective Mock appeared in the affidavit of Joseph Bassil, whose mother lived in the Montana Terrace apartments. Mr. Bassil accompanied Mr. Taylor to the police precinct one day during Summer 1992 after Mr. Parker and another person shot at him. He heard Detective Mock ask Mr. Taylor "to get him a list of crack houses at Montana Terrace." When Mr. Bassil objected on the ground that "it could get [Mr. Taylor] killed," Detective Mock told Mr. Bassil to mind his business. Later, he observed Mr. Taylor recording some addresses and "using [Mr. Bassil's] mother's telephone to communicate these addresses to Detective Mock." On another occasion, he witnessed Detective Mock picking up Mr. Taylor in an unmarked car, and saw Mr. Taylor return with food and $40 or $50.

Mr. Taylor's brother, Boyd Taylor, stated that he was unaware that his brother was assisting the police, but that he once saw a police drug raid in progress and when his brother ran out of an open-air drug market, the police made no effort to stop him. Similarly, Ms. Taylor's affidavit indicates that she "had no contemporaneous knowledge of [her son] assisting the police in the investigation of criminal activity or the murder of Martinez Crowder at Montana Terrace." However, when she met Detective Mock on the day of her son's murder, "Detective Mock told [her] that he had just left [her son] and when he

heard that [her son] had been murdered, he rushed back to Montana Avenue."

Also included in Ms. Taylor's exhibits in opposition to the District's summary judgment motion was an affidavit from Dr. R. Paul McCauley, plaintiff's expert witness. He asserted, in part, that: "[T]he applicable national standard of care regarding the safety of confidential informants is the *Schuster*[2] standard. *Schuster* says that when an informant collaborates with the police in the arrest or prosecution of criminals and it reasonably appears that the informant is in danger due to his collaboration, the police have a duty to provide a bodyguard or some other appropriate police protection." The "other appropriate police protection" included notification by telephone or in person that Mr. Ackwith would be released, a short-term witness program, or temporary relocation within the District. Dr. McCauley also mentioned standards promulgated by the Commission on Accreditation for Law Enforcement Agencies, Inc. (Standard Number 42.2.9 "requir[ing] mandatory written policies and procedures on using confidential informants"), and the International Association of Chiefs of Police (*e.g.*, Model Policy on Confidential Informants, and Concepts and Issues Paper on Confidential Informants).

While none of the exhibits presented by Ms. Taylor, in opposition to the District's motion for summary judgment, set forth facts detailing Mr. Taylor's personal reliance on any assurances of protection by the police detectives, her memorandum declares, in part,

> [A] jury could reasonably infer that, in light of Mr. Taylor's fear of guns and the fact that he did not possess a gun at the time of his death, that he received assurances from Detectives Fox and Mock that it was safe to return to the Montana Terrace Apartments after he had been shot in the buttocks by Rafael Parker and though he no longer lived in the neighborhood. [F]or example, Detectives Mock and Fox may have told Mr. Taylor that it was safe to return to Montana Terrace since both Ackwith— charged with the brutal murder of Crowder—and Rafael Parker were both in jail. Because Detectives [F]ox and Mock affirmatively used Mr. Taylor to assist them in their criminal investigations, they had a duty to use reasonable care to protect him from harm when they became aware that he had been placed in harm's way as a result of his collaboration with the police.

In addition, in his deposition, Thomas J. Stewart, a police officer, who had worked with Detective Mock, declared that Detective Lynch told Mr. Taylor to stay out of the Montana Terrace area, and that the police "offered him like a witness protection program or something."

At the commencement of the hearing on the District's motion for summary judgment, the motions judge warned Ms. Taylor's counsel that he was "inclined to grant summary judgment and dismiss the case entirely" because "it does not seem to me that the plaintiff has any admissible, that is non hearsay and non speculative evidence that [Mr.] Taylor, was a police informant...." In response, among other things, counsel for Ms. Taylor mentioned an exhibit (attached to the Joint Pretrial Statement), containing Detective Fox's handwritten notes, which included Mr. Taylor's name; and another, which apparently was in the handwriting of Mr. Taylor but produced by Detective Fox, containing the names of two witnesses to the murder of Mr. Crowder. Counsel for Ms. Taylor also emphasized the affidavits attached to

---

**2.** *Schuster v. City of New York,* 5 N.Y.2d 75, 180 N.Y.S.2d 265, 154 N.E.2d 534 (1958).

his opposition to the District's summary judgment motion.

The day following the hearing on the District's motion for summary judgment, the motions judge issued an order, stating, in part:

> Plaintiff has no *admissible, non-speculative* evidence that the deceased, Lawrence Taylor, was a police informant— that he was anything different from a *possible* citizen witness about some things or something, and a victim of crime himself. Plaintiff's affidavits show only *contact* with police, nothing more....

(Emphasis in original). The trial judge thus concluded that contact with the police did not mean that Mr. Taylor was an informant, or that there was a special relationship between Mr. Taylor and the police. Moreover, the trial judge determined that the District "has admissible, unrefuted evidence that [Mr. Taylor] was not an informant." The judge found Dr. McCauley's affidavit inadequate for two additional reasons: (1) failure to specify "any violation of a standard of care regarding notifying [Mr. Taylor] of the release of [Mr.] Ackwith"; and (2) "[Dr.] McCauley's statement of a violation of a standard of care from the absence of any written informant policy or policies bears no proximate cause relationship to [Mr.] Taylor's death." Consequently, the motions judge granted summary judgment in favor of the District.[3] Ms. Taylor filed a timely appeal.

## ANALYSIS

Ms. Taylor argues that the trial court erred in granting the District's motion for summary judgment, because there are genuine issues as to material facts that must be resolved; for example, "whether [Mr.] Taylor assisted Detectives Mock and Lynch in investigating criminal activity in the Montana Terrace area and whether [he] assisted Detective [ ] Fox in investigating the murder of Martinez Crowder." Moreover, relying primarily on *Schuster, supra,* she maintains that since her son was an informant who collaborated with the police in the arrest or prosecution of criminals, and because the police should reasonably have believed that he was in danger as a result of that collaboration, "the police [had] a duty to provide a bodyguard or some other appropriate police protection." The District contends that Ms. Taylor failed to submit evidence showing that her son was an informant for the police, or that there was a special relationship between him and the police.

■■■ We reiterated the legal standards governing our review of a motion for summary judgment in *Turner v. District of Columbia,* 532 A.2d 662 (D.C.1987):

> Summary judgment is properly granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Super.Ct.Civ.R. 56(c); *see Nader v. de Toledano,* 408 A.2d 31, 41 (D.C.1979), *cert. denied,* 444 U.S. 1078, 100 S.Ct. 1028, 62 L.Ed.2d 761[ ] (1980). On appeal this court must view the record in the light most favorable to

---

3. The trial court also referenced but did not rely on deposition excerpts from appellant's national standard of care expert who, during his deposition questioning by the District, acknowledged that if he "found out that [Mr.] Taylor was not either a paid or unpaid informant for the Metropolitan Police Department ..., [he] would think there was no special relationship and [Mr. Taylor] was not an informant." Furthermore, he did not think that if a person "just giv[es] information" to the police, he would be deemed to "have a special relationship with the Police Department[.]"

the party opposing the motion, and must resolve any doubt as to the existence of a factual dispute against the moving party. (Citations omitted). "In short, what we seek is evidence from which, were it accepted as true, a trier of fact might find for the appellant." *Truitt v. Miller*, 407 A.2d 1073, 1077 (D.C.1979).

*Id.* at 666. In addition, the legal principles applicable to our analysis of cases where individuals seek to hold the District liable for negligence or wrongful death because of a failure to protect a person, have been set forth in our prior cases. *See, for example, Flemmings v. District of Columbia*, 719 A.2d 963 (D.C.1998); *Powell v. District of Columbia*, 602 A.2d 1123 (D.C. 1992); *Hines v. District of Columbia*, 580 A.2d 133 (D.C.1990); *Wanzer v. District of Columbia*, 580 A.2d 127 (D.C.1990); *Klahr v. District of Columbia*, 576 A.2d 718 (D.C. 1990); *Turner, supra; Akins v. District of Columbia*, 526 A.2d 933 (D.C.1987); *Morgan v. District of Columbia*, 468 A.2d 1306 (D.C.1983) (en banc); *Platt v. District of Columbia*, 467 A.2d 149 (D.C.1983); *Warren v. District of Columbia*, 444 A.2d 1 (D.C.1981) (en banc). " 'The elements of a cause of action for negligence are a duty of care owed by the defendant to the plaintiff, a breach of that duty by the defendant, and damage to the interests of the plaintiff, proximately caused by the breach.' " *Turner, supra*, 532 A.2d at 666 (quoting *District of Columbia v. Cooper*, 483 A.2d 317, 321 (D.C.1984) (citations omitted)). With respect to the duty of care owed by the District in a case like the one before us, *Hines, supra*, emphasized the fundamental legal principle embodied in the public duty doctrine: "[A] government and its agents owe no general duty to provide public services ['such as police protection'] to particular citizens as individuals. [A]bsent some 'special relationship' between the government and the individual, the District's duty is to provide public services to the public at large." 580 A.2d at 136 (citing *Turner, supra; Morgan, supra*) (other citations omitted). "The general duty owed to the public may become a specific duty owed to an individual if the police and the individual are in a special relationship different from that existing between the police and citizens generally." *Warren, supra*, 444 A.2d at 5 (Appendix). A specific duty and a special relationship may be found "in the area of police services, ... 'when there is a course of conduct, special knowledge of possible harm, or the actual use of individuals in the [criminal] investigation.' " *Powell, supra*, 602 A.2d at 1129 (quoting *Warren, supra*, 444 A.2d at 3).

 Thus, in determining whether summary judgment in favor of the District was proper in the case before us, we must examine whether there was sufficient evidence, through affidavits, depositions, etc., which did not raise a genuine issue of material fact, to sustain the trial court's conclusion that the District owed no special duty to Mr. Taylor, and hence, no special relationship existed between him and certain District police detectives. To show a special duty owed by the District to Mr. Taylor, Ms. Taylor was required to "allege and prove two things: (1) a direct or continuing contact between [her son] and a governmental agency or official, and (2) a justifiable reliance on the part of [her son]." *Klahr, supra*, 576 A.2d at 720 (citing *Turner, supra*, 532 A.2d at 667 (other citations omitted)).[4] "The required contact

---

4. As in *Turner, supra*, the special duty or special relationship may be "established ... by a statute that prescribes 'mandatory acts clearly for the protection of a particular class of persons rather than the public as a whole.' " *Id.* at 667 (quotation and citation omitted). In the case before us, Ms. Taylor

must ... be a 'direct transaction with the party injured or an arms-length relationship in which the city's agent is dealing directly, in some form, with the person injured.'" *Powell*, 602 A.2d at 1130 (quoting *City of Tampa v. Davis*, 226 So.2d 450, 452–53 (Fla. 2nd Dist.Ct.App.1969)). Moreover, the government must engage in "'an affirmative undertaking'" of protection on which the victim justifiably relies. *Flemmings, supra*, 719 A.2d at 964 n. 7 (quoting *Morgan, supra*, 468 A.2d at 1317–18). "'Affirmative negligence'" is required, as opposed to "inaction or futile action." *Johnson v. District of Columbia*, 580 A.2d at 142, 143 (D.C.1990) (quotation omitted). Stated another way, Ms. Taylor must show a "justifiable reliance on a specific undertaking to render aid." *Hines, supra*, 580 A.2d at 138.[5]

*Schuster, supra*, the primary case on which Ms. Taylor relies, does not focus on the contact between the victim and the City of New York, except to say that he "supplied information to the Police Department ... leading to the arrest of ... Willie Sutton, a criminal of national reputation." *Schuster, supra*, 180 N.Y.S.2d 265, 154 N.E.2d at 536. Subsequent New York cases make it clear, however, as do decisions in this jurisdiction, that "some form of direct contact between the municipality's agents and the injured party" and "that party's justifiable reliance on the municipality's affirmative undertaking," are essential prongs of the special relationship test. *See Kircher v. City of Jamestown*, 74 N.Y.2d 251, 544 N.Y.S.2d 995, 543 N.E.2d 443, 446 (1989); *Cuffy v. City of New York*,

69 N.Y.2d 255, 513 N.Y.S.2d 372, 505 N.E.2d 937, 940 (1987); *see also Kubecka v. State of New York*, 249 A.D.2d 513, 672 N.Y.S.2d 122 (1998).

In *Kircher*, the New York Court of Appeals stressed the importance of the "requirement of direct contact, which is closely related to the element of reliance, [since it] serves to rationally limit the class of persons to whom the municipality's duty of protection runs and exists as a natural corollary of the need to show a special relationship between the claimant and the municipality." *Id.* at 446 (citing *Cuffy, supra*, 513 N.Y.S.2d 372, 505 N.E.2d at 940 (internal quotations omitted)).[6] After noting that "the direct contact requirement has not been applied in an overly rigid manner[,]" the court in *Cuffy* determined that "the proper application of the 'direct contact' requirement depends on the peculiar circumstances of each case, all of which must be considered in light of the policies underlying the narrow 'special duty' doctrine." *Cuffy, supra*, 513 N.Y.S.2d 372, 505 N.E.2d at 941. Not only do the New York courts regard the "direct contact" prong of the special relationship test to be important, and not always easy to apply, but they also have concluded that "the injured party's reliance is as critical in establishing the existence of a 'special relationship.'" *Id.* at 940 (citation omitted). Thus, even though justifiable reliance could be inferred from the evidence presented, if there is other evidence in the record indicating that no promised police protection existed prior to the injury, the

---

does not rely upon any statutory provision to prove the special duty or special relationship.

**5.** The Supreme Court of Washington recognizes a special relationship "where (1) there is direct contact or privity between the public official and the injured plaintiff which sets the latter apart from the general public, and (2) there are express assurances given by the

public official, which (3) gives rise to justifiable reliance on the part of the plaintiff." *Beal v. City of Seattle*, 134 Wash.2d 769, 954 P.2d 237, 244–45 (1998) (en banc).

**6.** There was no direct contact between the injured plaintiff and the City of New York in *Kircher, supra*.

**1216**

"justifiable reliance" prong may not be satisfied.

In *Cuffy, supra,* a case involving a bitter landlord-tenant dispute, the record contained no evidence that one of the plaintiffs, the landlords' son "even knew of the promise of protection . . . ." made by the police after his father requested such protection for his family. *Id.* at 941. In addition, there was evidence that the mother in *Cuffy* "had periodically looked out her front window throughout the day of the incident [the son was hit with a baseball bat when he sought to visit his parents, and severe injuries also were inflicted on the wife and another son], [but] had not seen any police pull up in front of her house . . . ." to arrest or restrain the tenant. *Id.* In light of this evidence, which the court concluded showed no "justifiable reliance," a judgment awarding substantial damages to the plaintiffs was reversed.

In contrast to *Cuffy,* the court in *Kubecka, supra,* a case in which two persons who provided information to law enforcement agents about organized crime were killed, determined that all of the elements of the special relationship test were satisfied.[7] In another police assistance case, a federal trial court in New York decided that summary judgment for the defendants was inappropriate. *Merced v. City of New*

*York,* 986 F.Supp. 774, 776 (D.N.Y.1997). There, a plaintiff who cooperated with law enforcement authorities in New York who sought to prosecute a known drug dealer, was shot by the drug dealer. Prior to being shot, she had obtained protective orders against the drug dealer, and had specifically requested assistance from the law enforcement authorities; an affidavit and deposition revealed that the authorities had " 'explained to [the plaintiff] . . . the options she had as far as protection.' " *Id.* at 777. The options for protection were also explained to the plaintiff's mother by a police detective. *Id.* at 776. The court concluded that there were genuine issues of fact "as to both the existence of a special relationship and the issue of proximate cause"; and that "[a] reasonable jury could find, on [the] facts [presented], that defendants owed a special duty to [her], that they failed to meet their obligations to [her], and that, as a proximate result, she was shot." *Id.*

■■■ While Ms. Taylor's amended complaint and the Joint Pretrial Statement filed in the trial court allege events which arguably could satisfy one prong of the special relationship test as developed by our prior cases, as well as precedent from the New York courts,[8] her affidavits and

7. The Appellate Division affirmed the trial court's finding of a special relationship in *Kubecka, supra,* because:
 The evidence revealed that OCTF [Organized Crime Task Force] agents solicited [the plaintiffs] to cooperate in that agency's investigation into illegal garbage carting in Suffolk County. As part of the arrangement, OCTF gave [the plaintiffs], and their families, assurances that they would be protected from harm if they cooperated with the investigation. . . . Furthermore, several OCTF agents knew, and testified that they knew, of the potential for physical harm and death to the informants in this case. [The plaintiffs] had direct contact with various OCTF agents and certain of these

agents had even given them their home telephone numbers.
 Finally, in view of the past efforts that OCTF had made on behalf of the victims' families in response to threats made against them, and of which efforts the victims were aware, it is clear that the victims justifiably relied on OCTF taking appropriate protective measures as needed.
 *Id.* at 123.

8. Ms. Taylor's amended complaint alleged that her son was an informer for the Fifth *District of the Metropolitan Police Department* and was "providing information regarding illegal activities at the Montana Terrace

other record documents do not provide adequate proof that both prongs of the test have been established. The affidavits submitted by Mr. Taylor's mother and brother reveal that neither was aware of his alleged role as an informant. It is unlikely that these immediate family members would not have been told that the police had promised to provide protection because of Mr. Taylor's role as a police informant. Significantly, neither Ms. Taylor's affidavit, nor that of Boyd Taylor, mentions any occasion on which they asked for "special police protection," or "were escorted from their apartment . . . .," as alleged in the amended complaint. Moreover, neither Mr. Crowder's mother's affidavit, nor that of Mr. Bassil mentions any promise made by the police to protect Mr. Taylor and his family, even when Mr. Bassil told Detective Mock, in the presence of Mr. Taylor, that providing a list of crack houses at Montana Terrace "could get [Mr. Taylor] killed." Rather than indicating that the Taylor family would receive protection, Detective Mock told Mr. Bassil to mind his own business. In addition, Dr. McCauley was not a fact witness, and hence, his affidavit contains no facts relating to Mr. Taylor's direct contacts with Detectives Fox, Mock, and Lynch, or any alleged promises of protection made by the police detectives.

During his deposition, Officer Thomas J. Stewart indicated that he "heard" that Mr. Taylor provided information to the police about Montana Terrace. When asked the source of his information, Officer Stewart replied: "I think it was Detective LaJuan Lynch. I think I heard it from her." Continuing, he said that Detective Lynch told him that "they offered him like a witness protection program or something." In response to additional questions, Officer Stewart asserted: "[Detective Lynch] said she had offered him some type of witness protection to keep him out of the area. [Mr. Taylor] said he didn't need it, he was going to stay in southeast, I believe is what she said." Significantly, the record excerpts from Detective Lynch's deposition do not mention any promise of protection.

Even when read in the light most favorable to Ms. Taylor, the affidavits and other record material on which she relies, unlike the proof in *Kubecka* and *Merced, supra,* do not present evidence sufficient to show that both prongs of the special relationship test have been met. While Ms. Taylor presented some evidence on which a reasonable jury arguably could find that there was direct contact between Mr. Taylor and District police detectives, the evidence was insufficient as a matter of law to establish "a justifiable reliance on the part of [Mr. Taylor]." *Klahr, supra,* 576 A.2d at 720 (citing *Turner, supra,* 532 A.2d at 667) (other citations omitted).

Apartments." It also alleged that in April 1993, he gave information:

[W]hich led to the arrest of Raphael Parker, the alleged leader of a gang operating in the area known as the "Cop Killer Crew" and an individual who assaulted Mr. Taylor on at least two occasions while armed with the intent to murder. On one occasion, [Mr.] Parker and his gang shot out the windows in the apartment of the Taylor family and attempted to break down the front door.

The amended complaint alleges that Mr. Taylor and his family asked for "special police protection on two occasions and were escorted from their apartment at Montana Terrace on at least one occasion." The Joint Pretrial Statement asserts that Mr. Taylor "provided information critical to the arrest of Antoine Fice Ackwith for [Martinez] Crowder's murder"; that he was an informer for Detectives Mock and Lynch, providing addresses of crack houses and assisting in the arrest of Mr. Parker; and on or about April 14, 1993, he was shot in the buttocks by Mr. Parker at the Montana Terrace Apartments.

 This court has adhered to a strict interpretation of the special relationship test, including the justifiable reliance prong. For example, in *Morgan, supra,* we said that, "[j]ustifiable reliance . . . means particular or special reliance." 468 A.2d at 1315. Consequently,

> More than general reliance is needed to require the police to act on behalf of a particular individual. The plaintiff must specifically act, . . . or refrain from acting . . ., in such a way as to exhibit particular reliance upon the actions of the police in providing personal protection. Liability is established, therefore, if the police have specifically undertaken to protect a particular individual and the individual has specifically relied upon the undertaking.

*Id.* (Citations omitted). The evidence submitted by Ms. Taylor is inadequate to establish either that the police undertook the protection of Mr. Taylor, or that Mr. Taylor relied on the police for protection.

 In *Flemmings, supra,* we noted that: "In only one case have we found . . . a special relationship to exist, and in that instance it was based on a statute that specifically created certain rights and protections for members of a designated class (abused and neglected children)." 719 A.2d at 964 n. 6 (referencing *Turner, supra*). No such statute is implicated in this case. Nor is the evidence tendered by Ms. Taylor sufficient to prove that her son fell into the special, protected category of a police informant, which made him a " 'rea-sonably forseeable plaintiff,' " subject to injury or death. *Powell, supra,* 602 A.2d at 1130 (quoting *Warren, supra,* 444 A.2d at 10). Furthermore, that evidence is insufficient to establish that a genuine issue of material fact exists as to whether Mr. Taylor was a police informant. As the motions judge recognized, contacts with the police do not automatically turn a citizen into a paid or unpaid informant.[9]

None of the prior cases in this jurisdiction factually mirror the one before us. However, both *Kubecka* and *Merced, supra,* involved situations where plaintiffs assisted law enforcement agents and alleged their negligence in failing to protect them from known criminals. There was evidence in *Kubecka, supra,* that law enforcement agents solicited the cooperation of the plaintiffs in investigating organized crime; and that they gave assurances to the plaintiffs and their families that they would be protected. There was also evidence indicating that the law enforcement agents knew of the danger of injury or death to the plaintiffs because of their cooperation; that the agents gave the plaintiffs their home telephone numbers; and that the agents had responded to previous threats against the plaintiffs, of which the plaintiffs were aware. *Id.* at 514, 672 N.Y.S.2d 122. Thus, the court had a substantial basis for concluding that: "the [plaintiffs] justifiably relied on [the law enforcement agents] taking appropriate protective measures as needed." *Id.* A similar "justifiable reliance" finding was made in *Merced, supra,* based upon the

---

9. "Some states recognize a breach of a duty to a specific individual when the police fail to protect a victim who is a member of a special class, such as an informant, an undercover agent who is aware of a specific threat, or a witness summoned by the police to make an identification." *Taylor v. Phelan,* 9 F.3d 882, 887 (10th Cir.1993) (citations omitted). Nothing in the record in this case indicates that Mr. Taylor was an undercover agent. In addition, Duan Craig and Devon Howard Mack were to be the key witnesses against Mr. Ackwith had he been tried for the murder of Mr. Crowder; Mr. Taylor may have been used as an impeachment or rebuttal witness. Nothing in the record on appeal reveals that Mr. Taylor was summoned to identify any person in connection with the murder of Mr. Crowder, or anyone connected with the earlier assault on Mr. Taylor.

affidavits, depositions, orders of protection, and a hearing transcript presented by the plaintiff.[10]

In Ms. Taylor's case, the evidence of her son's justifiable reliance on "an affirmative undertaking [by the police] to protect [him]," is virtually non-existent. *Flemmings, supra,* 719 A.2d at 964 n. 7 (quoting *Morgan, supra,* 468 A.2d at 1314). At best, Ms. Taylor's evidence of an affirmative undertaking by the police to protect her son is limited to the deposition of Officer Stewart who recounted what he thought was a conversation with Detective Lynch, indicating that the police "offered [Mr. Taylor] like a witness protection program or something" or "some type of witness protection to keep him out of the area." Assuming, without deciding, that Officer Stewart's testimony would be admissible at trial under some exception to the hearsay rule,[11] it would not support

Ms. Taylor's need to satisfy the requirement of "justifiable reliance," because it would negate Mr. Taylor's reliance on any police protection since Officer Stewart thought Detective Lynch reported that, "[Mr. Taylor] said he didn't need it [that is, police protection].…" In addition, Mr. Bassil's affidavit establishes that Detective Mock did not offer protection to Mr. Taylor when he asked him to obtain a list of crack houses in the Montana Terrace area; and both Ms. Taylor's affidavit, and that of her other son, Boyd Taylor, reveal that they were unaware even that Mr. Taylor was an informant for the police. Indeed, in her memorandum in support of her opposition to the District's motion for summary judgment, Ms. Taylor resorts to what she believes a jury "could reasonably infer … in light of Mr. Taylor's fear of guns and the fact that he did not possess a

---

10. Plaintiff's evidence showed that law enforcement agents for the New York City Housing Authority Police Department and the New York City Police Department sought her assistance in arresting a known drug dealer with whom she had an association. She agreed after options for protection were explained to her mother and to her. When the drug dealer was arrested but later released because of his offer to cooperate with the law enforcement authorities, the plaintiff contacted a police detective who assured her that the drug dealer did not know of her cooperation. He instructed her to call the police "whenever he is doing anything else funny, call us, and we will get him." *Merced, supra,* 986 F.Supp. at 777. The drug dealer began to harass the plaintiff. She obtained court orders of protection against him. The harassment continued despite the orders of protection. On one occasion, the drug dealer hit the plaintiff in her face with brass knuckles. Although the plaintiff showed a local police precinct officer her order of protection, he said he could do nothing. Several days later, the plaintiff was kidnaped at gunpoint by the drug dealer who threatened "to cut her up in pieces" with a chain saw. *Id.* at 778. After the drug dealer released the plaintiff, he followed her, snatched their child (the drug dealer was the

biological father of the plaintiff's son) and threatened to kill him. *Id.* This incident was reported to a detective who initiated successful efforts to get the child from the drug dealer. A couple of weeks later, someone fired ten gunshots into the living room of the plaintiff's cousin while plaintiff was there. *Id.* Law enforcement authorities were notified, and the plaintiff was told that as a witness to kidnaping, she would be protected. *Id.* No protection was forthcoming, and the plaintiff obtained additional court orders of protection. She also asked for relocation, but no action was taken on her request. *Id.* On the morning the plaintiff was scheduled to testify against the drug dealer, she was informed that the matter had been adjourned. While she was putting out the trash a bit later, two unknown assailants shot her six times; two shots hit her in the shoulder and cheekbone. *Id.* at 779.

11. Citing *District of Columbia v. Washington,* 332 A.2d 347 (D.C.1975), Ms. Taylor contends that the hearsay statements of Officer Stewart and Assistant U.S. Attorney Walutes "should have been admitted into evidence as admissions against party opponent (Defendant) by employees or agents of the [District]."

gun at the time of his death ....," and what Detectives Mock and Fox "may have told Mr. Taylor." These arguments cannot substitute for evidence of "justifiable reliance."

Based upon our review of the record, we detect no genuine issue as to any material fact. Moreover, in light of the lack of evidence presented by Ms. Taylor as to any affirmative undertaking of protection by the police, or her son's justifiable reliance on police protection, her case is vastly different from that of *Kubecka* and *Merced, supra.* In addition, the affidavits, deposition testimony and other evidence she submitted in opposition to the District's motion for summary judgment do not satisfy the "justifiable reliance" prong of the special relationship test as articulated in *Flemmings, Morgan* and *Turner, supra.* Therefore, the District is entitled to judgment as a matter of law.[12]

Accordingly, for the foregoing reasons we affirm the judgment of the trial court.

*So ordered.*

12. We do not address Ms. Taylor's points relating to Dr. McCauley's affidavit and that of former Police Chief Jerry Wilson, because we are satisfied that the motions court did not rely upon them in making its pivotal findings. Furthermore, since Ms. Taylor does not allege prejudice concerning the date on which the motions court scheduled the hearing on the District's motion for summary judgment, we do not consider that challenge to the exercise of discretion by the motions court. Finally, given our disposition, Ms. Taylor's contentions regarding her economic expert are moot.